UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., Plaintiff, | : | |
| v. | : | No. 04-473-T |
| AMERICAN TELECASTING OF YOUNGSTOWN, INC., Defendant. | : | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to F.R. Civ. P. 56, plaintiff North American Catholic Educational Programming Foundation, Inc. hereby moves for summary judgment.

In support of this motion, the Court is respectfully referred to the accompanying memorandum and affidavits.

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.

By its Attorneys,

Mark A. Pogue #3441
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of October, 2005 a copy of the foregoing Plaintiff's Motion For Summary Judgment was served by first class mail, postage prepaid to:

Wayne Dennison, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Jennifer L. Brooks, Esq.
Brown Rudnick Berlack Israels LLP
One Providence Washington Plaza
Providence, RI 02903

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., Plaintiff, | : | |
| v. | : | No. 04-473-T |
| AMERICAN TELECASTING OF YOUNGSTOWN, INC., Defendant. | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") submits this memorandum in support of its motion for summary judgment. As shown below, there are no genuine issues of material fact in this case, and NACEPF is entitled to judgment as a matter of law.

**Background**

NACEPF is an independent lay organization that is engaged in producing and broadcasting religious and educational programming for television and radio stations pursuant to licenses issued by the Federal Communications Commission ("FCC"). Affidavit of John Primeau ("Primeau Aff."), ¶ 2. NACEPF is based in Rhode Island. Id.

In 1991, NACEPF entered into an agreement captioned ITFS Excess Capacity Airtime Lease Agreement (the "Agreement") with American Telecasting of Youngstown, Inc. ("American"). Primeau Aff., ¶ 3. American has subsequently become a wholly owned subsidiary of Sprint Corporation ("Sprint"). Id.

The FCC authorizes the issuance of licenses for Instructional Television Fixed Service ("ITFS") channels, and has authorized licensees to lease excess capacity in their authorized spectrum to non-ITFS users. Primeau Aff., ¶ 4. In the expectation that NACEPF would receive an FCC license for ITFS channels in the Youngstown, Ohio metropolitan area, NACEPF and American executed the Agreement to allow American to lease certain excess capacity from NACEPF for commercial programming. Id. A copy of the Agreement is attached as Exhibit A to the Complaint. The signature page is attached as Exhibit A to the Primeau Affidavit.

Paragraph 1A of the Agreement specified that the term of the Agreement would be five years, and that this term would begin when the FCC licensed NACEPF to operate ITFS television channels in the Youngstown market. Agreement, ¶ 1A.

The FCC granted NACEPF an ITFS license in the Youngstown market on April 30, 1993 with the call sign of WLX-81, authorizing NACEPF to operate on the C group of channels C1, C2, C3 and C4. Primeau Aff., ¶ 6. Thus, the initial term five-year of the Agreement ran from April 30, 1993 to April 30, 1998. Id.

On May 30, 1997, NACEPF and American executed a document captioned Third Amendment to ITFS Excess Capacity Airtime Lease Agreement (the "Amendment") which revised the renewal provisions contained in the Agreement. A copy of the Amendment is attached as Exhibit B to the Primeau Affidavit. Paragraph B(a) of the Amendment provided for a renewal term of five (5) years that would commence automatically unless American served NACEPF with a written notice of its election not to renew the Agreement at least sixty (60) days prior to the expiration of the initial term. Id.

American did not serve NACEPF with written notice of its election not to renew the Agreement. Primeau Aff., ¶ 9. As a result, pursuant to Paragraph B(a), the Agreement

automatically renewed for a period of five (5) years, commencing on April 30, 1998 and ending on April 30, 2003.

Paragraph B(b) of the Amendment provided for the Agreement to renew for an additional five-year term (the "Additional Renewal Term"), from April 30, 2003 through April 30, 2008. In its entirety, Paragraph B(b) reads as follows:

> (b) Unless terminated pursuant to any applicable provision of the Agreement, this Agreement shall automatically and without further notice be extended for an additional renewal term (the "Additional Renewal Term") of five (5) years, unless the number of Subscribers to Lessee's System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, does not equal or exceed 7,882 (the number of Subscribers to Lessee's System as of January 31, 1997, multiplied by a factor of two (the "Subscriber Multiple")), in which event, the Agreement shall expire at the end of the Renewal Term unless Lessor, at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option"). Lessee shall provide Lessor with the number of Subscribers to Lessee's System (the "Subscriber Information") as of the Subscriber Date no later than ten (10) days subsequent to the Subscriber Date. In the event the number of Subscribers to Lessee's System on the Subscriber Date does not equal or exceed the Subscriber Multiple and unless Lessor exercises its Renewal Option within ten (10) days from receipt of the Subscriber Information, Lessor shall be deemed to have not exercised the Renewal Option and the Agreement shall expire at the end of the Renewal Term.

Whereas Paragraph B(a) of the Amendment required American to serve NACEPF with a written notice in the event American elected not to renew the Agreement for the period April 30, 1998 through April 30, 2003, Paragraph B(b) did not require NACEPF to give notice to American in any particular manner in the event NACEPF elected, at its option, to renew the Agreement for the Additional Renewal Term. Amendment, ¶ B(b).

The "Subscriber Date" referred to in the Amendment was January 30, 2003. Primeau Aff., ¶ 10. This was 90 days prior to April 30, 2003, the last day of the first renewal term. Id.

Under Paragraph B(b) of the Amendment, American was required to provide certain "Subscriber Information" to NACEPF no later than February 9, 2003 – ten days after the Subscriber Date (January 30, 2003). Primeau Aff., ¶ 12. The Subscriber Information was supposed to set forth the number of subscribers to American's system in Youngstown as of the Subscriber Date (January 30, 2003). Id.

NACEPF never received the Subscriber Information. Primeau Aff., ¶ 16.

On February 14, 2003, NACEPF received, by Federal Express delivery, a document from Sprint (American's corporate parent) captioned "NACEPF Channel Lease Analysis – Sprint BWG." (the "Channel Lease Analysis"). Primeau Aff., ¶ 12. This document was not sent to the addresses for NACEPF given in the Agreement. Id., ¶ 15. NACEPF did not understand Sprint's sending of the Channel Lease Analysis to constitute the provision of the Subscriber Information referred to in Paragraph B(b) of the Agreement. Id., ¶ 13.

There was no cover letter accompanying the Channel Lease Analysis, and no reference in the document itself to the Agreement or the Amendment or the expiration or renewal of the Amendment. Primeau Aff., ¶ 13. The Channel Lease Analysis did not contain the Subscriber Information for the Youngstown channels as of the Subscriber Date (January 30,.2003). And the Channel Lease Analysis was not specific to the Youngstown market at issue in the Agreement; instead, it presented general subscriber information for 20 different markets in which Sprint (or a subsidiary) was then leasing excess capacity from NACEPF, and showed how Sprint calculated its monthly lease payment for all of these markets. Id. NACEPF received a similar multi-market summary from Sprint every month. Id.

NACEPF elected to renew the Agreement for the Additional Renewal Term (April 30, 2003 through April 30, 2008) referred to in Paragraph B(b) of the Amendment. Primeau Aff., ¶

17. In connection with this election, on December 2, 2002 NACEPF's attorney, Howard Barr, transmitted to the FCC on behalf of NACEPF an application for renewal of NACEPF's FCC license for Youngstown. Affidavit of Howard Barr ("Barr Aff."), ¶ 4. Although the Amendment did not require NACEPF to notify American in any particular manner of NACEPF's election to renew the Agreement for the Additional Renewal Term, Barr sent Sprint a copy of his December 2, 2002 submission to the FCC because, inter alia, he wanted to confirm with Sprint that NACEPF and Sprint would have a continuing relationship in the Youngstown market. Id., ¶ 5.

Sprint has never denied that it was aware of NACEPF's application to renew its FCC license for Youngstown. Barr Aff., ¶ 7. Indeed, Sprint provided Barr with information NACEPF needed to submit that application to the FCC. Id., ¶ 6.

From April through December 2003, there was no change in the relationship between NACEPF and American (or Sprint) insofar as the Agreement was concerned. Primeau, Aff., ¶ 18. Every month Sprint sent a check to NACEPF (on behalf of American) for the amount owed pursuant to the Agreement. Every month Sprint sent a Channel Lease Analysis detailing how Sprint calculated its monthly lease payment for the different markets (including Youngstown) in which it leased capacity from NACEPF. Because Sprint continued to pay NACEPF the monthly amounts owed under the Agreement, NACEPF believed that Sprint understood that the Agreement had been renewed for the Additional Renewal Term. NACEPF therefore made no efforts to find other users for NACEPF's excess capacity. Id.

In December 2003 Sprint informed NACEPF, for the first time, that Sprint took the position that the Agreement had previously expired. Primeau Aff., ¶ 19. The last payment Sprint made to NACEPF occurred in January 2004. Id.

As of October 1, 2005, American (or Sprint) will owe NACEPF $67,375.31 under the Agreement. Primeau Aff., ¶ 20. American will owe NACEPF $2,576.40 per month under the Agreement beginning in November 2005 until it expires on April 30, 2008. Id.

In other leasing agreements NACEPF has made with Sprint subsidiaries, NACEPF has renewed those agreements in exactly the same manner that it renewed the Agreement. Primeau Aff., ¶ 21. For example, NACEPF has executed ITFS excess capacity airtime leases with Sprint subsidiaries for NACEPF's excess authorized spectrum capacity in Colorado Springs, Colorado; Fresno, California; Lansing, Michigan; Denver, Colorado; Santa Rosa, California; Columbus, Ohio; Seattle, Washington; and Yuba City, California. Id. Like the Amendment at issue in this case, all of these agreements were amended by a Third Amendment effective as of May 30, 1997. The Third Amendments in the case of these other markets contained language identical to that contained in the Amendment. Primeau Aff., Exh. E. In every one of these other leases, the number of subscribers as of the Subscriber Date was below the specified threshold. In every one of these other contracts, NACEPF exercised its right to renew the lease for an Additional Renewal Term without providing any particular form of notice to the Sprint subsidiary other than sending the subsidiary a copy of NACEPF's FCC renewal application. Id. In every case the subsidiary has continued to make its monthly payments. (The Additional Renewal Terms began on the following dates in these cities: Colorado Springs -- August 6, 2001; Fresno -- September 24, 2001; Lansing -- March 27, 2002; Danver -- April 10, 2002; Santa Rosa -- August 14, 2002; Columbus -- October 10, 2002; Seattle -- October 28, 2002; Yuba City -- June 30, 2005.)

NACEPF relied on the course of conduct established with Sprint and its subsidiaries in renewing the Amendment applicable to Youngstown. Primeau Aff., ¶ 22. It followed exactly the same practice in renewing that Agreement in April 2003 as it had in renewing seven other

ITFS excess capacity lease agreements with Sprint Subsidiaries in 2001 and 2002. Yet, in the case of Youngstown, American stopped making payments after January 2004. Id.

## Argument

NACEPF exercised its option to renew the Agreement for the Additional Renewal Term. As a result, the Agreement remains in effect and requires payments from American through April 30, 2008. American is estopped from denying that the Agreement was renewed.

### I. The Agreement Remains In Effect Because NACEPF Renewed The Agreement For The Additional Renewal Term

Paragraph B(b) of the Amendment gives NACEPF the ultimate right to extend the Agreement through April 30, 2008. The paragraph begins with the premise that the Agreement will "automatically and without further notice be extended" for the Additional Renewal Term. But the paragraph then makes this automatic-renewal premise subject to two contingencies, which operate in opposite directions. First, if the Subscriber Information falls below a certain threshold on a particular day (January 30, 2003), the automatic-renewal premise is overridden, and the Agreement presumptively expires. However, even if the Subscriber Information falls below the threshold, paragraph B(b) gives NACEPF the right, "at its sole option and discretion," to renew the Agreement for the Additional Renewal Term.

The evidence is undisputed that NACEPF exercised its option to renew the Agreement for the Additional Renewal Term. Primeau Aff., ¶ 17. American is therefore required to continue making payments through April 30, 2008.

#### A. NACEPF Was Not Required To Notify American Of Its Election

American cannot avoid this conclusion on grounds that NACEPF failed to give notice of its election to renew. Paragraph B(b) contains no such notice requirement. In contrast, Paragraph B(a) specifies that, if American elected to terminate the Agreement before the initial



PRV_762128_1/MPOGUE

renewal term (April 30, 1998 – April 30, 2003), it was required to send written notice of that election to NACEPF. The fact that Paragraph B(a) required American to provide notice of its election shows that, if the parties had also intended to require NACEPF to provide notice of its election, they would have so specified.[1]

**B. NACEPF's Election Was Not Untimely**

Nor can American establish that NACEPF's election to renew was somehow untimely. Paragraph B(b) required American to submit its Subscription Information to NACEPF "no later than" February 9, 2003, and gave NACEPF ten days thereafter to exercise its option to renew. But for numerous reasons, NACEPF's ten-day exercise period never began to run. First, the Subscription Information was supposed to specify the subscriber count as of January 30, 2003. NACEPF never received that information. Primeau Aff., ¶ 10. Since NACEPF had ten days "from receipt of the Subscriber Information" to exercise its option to renew, and because the Subscriber Information never arrived, NACEPF's exercise of its option to renew could not possibly have been untimely.

Second, the parties use of the phrase "no later than" in Paragraph B(b) means that time was of the essence regarding American's deadline for providing the Subscription Information. See, e.g., Salishan Hills, Inc. v. Krieger, 660 P.ed 160, 163 (Or. App. 1983) (use of phrase "no later than" means time is of the essence); Two Towers Development, Inc. v. Butternut Apartments, Inc., 599 N.W. 2d 839, 844 (Neb. 1999) (same). When time is of the essence, a breach of the specified time deadline will excuse nonperformance by the other party. Safeway System, Inc. v. Manuel Bros. Inc., 228 A.2d 851, 856 (R.I. 1967).

---

[1] In any event, the record demonstrates that NACEPF did notify American's corporate parent, Sprint Corporation, of its intention to renew the Agreement for the Additional Renewal Term. NACEPF contacted Sprint to obtain information needed for NACEPF's renewal application for its FCC license for Youngstown, then sent Sprint a copy of the application when it was submitted to the FCC. Barr Aff., ¶¶ 5, 6.

Here, American breached the requirement that it provide the Subscriber Information "no later than" February 9, 2003. Since time was of the essence, American's breach relieved NACEPF of the obligation to exercise its option, if at all, within ten days of receiving the Subscriber Information.

Third, the Agreement specifies (at paragraph 21) that all notices to NACEPF are to be given in a specific manner (personal delivery or by certified mail) and to a specific address (P.O. Box 40026, Providence, Rhode Island or 47 Meadowview Boulevard, North Providence, Rhode Island). The Channel Lease Analysis was not sent to the specified address or in the specified manner. Primeau Aff., ¶¶ 14, 15. For this reason also, the Channel Lease Analysis sent by American was not effective for purposes of providing the Subscriber Information to NACEPF. See, e.g., Nissan Motor Corporation v. Fred Anderson Nissan, 445 S.E. 2d 600, 601 (N.C. 1994) (Federal Express delivery did not satisfy requirement that notice be provided by certified mail); cf. Audio Enterprises, Incorporated v. B & W Loudspeakers, 957 F.2d 406, 409 (7th Cir. 1992) ("Federal Express is not first class mail.").[2]

Because American never provided the Subscription Information -- let alone in accordance with the time, place and manner specified in the Agreement – the time for NACEPF to elect to renew never began to run. NACEPF's election therefore could not have been untimely.

[2] The three obligations of American discussed above -- that it provide the Subscription Information, that it do so by February 9, 2003, and that it do so in a specific manner -- can also be viewed as condition precedents to NACEPF's obligation to exercise its right to renew within the ten day period. [N]o particular form of wording is necessary to create a condition precedent." Sclafini v. Gama, 1993 WL 853861 *3 (R.I. Super. 1993) (Gibney, J.), quoting Chiricella v. Erwin, 310 A.2d 555, 270 Md. 178 (1973). A condition precedent is simply one which "had to be satisfied before the parties [are] obligated to perform." Id. "Where a contractual duty is subject to a condition precedent, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused." Id. Because these conditions precedent were not performed by American, there was no breach on the part of NACEPF of any obligation to inform American of its election to review within a particular time.

## II. The Doctrine Of Equitable Estoppel Precludes American From Denying That The Agreement Was Renewed For The Additional Renewal Term

"Under the doctrine of equitable estoppel, a party may be precluded from enforcing an otherwise legally enforceable right because of previous actions of that party." Retirement Board v. DiPrete, 845 A.2d 270, 284 (R.I. 2004). For equitable estoppel to apply, the following elements must be established:

> first, an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct in fact did induce the other to act or fail to act to his injury.

El Marocco Club, Inc. v. Richardson, 746 A.2d 1228, 1233 (R.I. 2000). It is well-settled that a course of conduct between two parties can provide the basis for invoking the equitable estoppel doctrine. Shea v. Gamco, Inc., 98 A.2d 864, 867 (R.I. 1953); Martines v. Terminal Methods, Inc., 225 A.2d 790, 792 (R.I. 1967).

The record in this case establishes that NACEPF and Sprint (through its subsidiaries) established a course of dealing with respect to the renewal of ITFS excess capacity agreements. As the Primeau Affidavit establishes, NACEPF and Sprint subsidiaries executed such agreements with respect to eight other U.S. cities. Primeau Aff., ¶ 21. All of those agreements were modified by third amendments containing language identical to the language in the Third Amendment at issue here. Id. In every one of the other contracts, the Sprint subsidiary continued to make payments during the Additional Renewal Term even though the subscriber count was below the specified threshold and NACEPF followed the same renewal procedures as it did here. Id. The renewals for seven of these other cities occurred before April 30, 2003, when the Additional Renewal Term in the instant case began. Id.

In connection with the Amendment at issue here, NACEPF relied, to its detriment, on the course of conduct established with the Sprint subsidiaries in these other contracts. Primeau Aff., ¶ 22. In particular, based on that prior course of conduct, NACEPF followed the same practice in renewing the Agreement as it had in renewing seven other ITFS lease agreements with Sprint subsidiaries in 2001 and 2002. Id. As a result, the doctrine of equitable estoppel applies, and precludes American from denying that the Agreement was renewed. Put plainly, Sprint cannot establish a course of conduct with respect to seven contracts, then punish NACEPF when it adheres to that practice with respect to an identical eighth contract.

The fact that American made nine payments to NACEPF under the Amendment (Primeau Aff., ¶ 19) -- which it now says was never effective -- confirms this conclusion. It appears that American itself initially intended to adhere to the course of dealing that had been established with respect to the other seven contracts. Its belated decision to reverse course and assert a different position here only emphasizes how untenable its position is.

## Conclusion

For the foregoing reasons, NACEPF's motion for summary judgment should be granted. In particular, the Court should enter judgment for NACEPF in the amount of $67,375.31

representing sums owed through October 31, 2005, and declare that the Agreement is effective and in force.

NORTH AMERICAN CATHOLIC
EDUCATIONAL PROGRAMMING
FOUNDATION, INC.

By its Attorneys,

Mark A. Pogue #3441
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of October, 2005 a copy of the foregoing Memorandum In Support of Plaintiff North American Catholic Educational Programming Foundation, Inc.'s Motion For Summary Judgment was served by first class mail, postage prepaid to:

Wayne Dennison, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111

Jennifer L. Brooks, Esq.
Brown Rudnick Berlack Israels LLP
One Providence Washington Plaza
Providence, RI 02903