UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., | : | |
| Plaintiff, | : | |
| v. | : | No. 04-473-T |
| SPRINT CORPORATION and AMERICAN TELECASTING OF YOUNGSTOWN, INC., | : | |
| Defendants. | : | |

**AFFIDAVIT OF JOHN PRIMEAU**

I, John Primeau, hereby declare and state as follows:

1. I am the president of North American Catholic Educational Programming Foundation, Inc. ("NACEPF"). I have personal knowledge of the facts set forth below.

2. NACEPF is an independent lay organization that is engaged in producing and broadcasting religious and educational programming for television and radio stations pursuant to licenses issued by the Federal Communications Commission ("FCC"). NACEPF is based in Rhode Island.

3. In 1991, NACEPF entered into an agreement captioned ITFS Excess Capacity Airtime Lease Agreement (the "Agreement") with American Telecasting of Youngstown, Inc. ("American"). American subsequently became a wholly owned subsidiary of Sprint Corporation. An executed copy of the Agreement is attached to the Complaint filed in this matter. I have attached the first page and the signature page of the Agreement as Exhibit A hereto.

4. As the Agreement reflects, the FCC had authorized the issuance of licenses for Instructional Television Fixed Service ("ITFS") channels and had authorized licensees to lease excess capacity in their authorized spectrum to non-ITFS users. In the expectation that NACEPF would receive an FCC license for ITFS channels in the Youngstown, Ohio metropolitan area, NACEPF and American executed the Agreement to allow American to lease certain excess capacity from NACEPF for commercial programming.

5. Paragraph 1A of the Agreement specified that the term of the Agreement would be five years, and that this term would begin when the FCC licensed NACEPF to operate ITFS television channels in the Youngstown area.

6. The FCC granted NACEPF an ITFS license in the Youngstown area on April 30, 1993 with the call sign of WLX-851 authorizing operation on the C group channels C1, C2, C3 and C4. Thus, the initial five-year term of the Agreement ran from April. 30, 1993 to April 30, 1998.

7. On May 30, 1997, NACEPF and American executed a document captioned Third Amendment to ITFS Excess Capacity Airtime Lease Agreement (the "Amendment") which revised the renewal provisions contained in Agreement. A copy of the Amendment is attached hereto as Exhibit B.

8. The Amendment provided for a renewal term of five (5) years that would commence automatically unless American served NACEPF with a written notice of election not to renew the Agreement at least sixty (60) days prior to the expiration of the initial term.

9. American did not make such an election. As a result, the Agreement automatically renewed for a term of five (5) years, commencing on April 30, 1998 and ending on April 30, 2003.

10. Paragraph B(b) of the Amendment provided for the Agreement to renew for an additional five-year term (the "Additional Renewal Term"), from April 30, 2003 through April 30, 2008. In particular, paragraph B(b) provided that the Agreement would expire if the number of subscribers (the "Subscriber Information") to American's system as of the "Subscriber Date" (which was January 30, 2003, the date ninety (90) days prior to the expiration of the first renewal term) was less than 7,882, unless NACEPF, "in its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term." According to paragraph B(b), American was to provide its Subscriber Information to NACEPF "no later than ten (10) days subsequent to the Subscriber Date." Paragraph B(b) specified that NACEPF had ten (10) days after receipt of the Subscriber Information to exercise its right to renew the Agreement for an additional five-year term through April 30, 2008.

11. In the event that NACEPF elected to renew the Agreement for the Additional Renewal Term, the Agreement did not specify that NACEPF give notice to American of this election in any particular manner.

12. Under paragraph B(b) of the Agreement, American was required to provide NACEPF with the Subscriber Information "no later than ten (10) days subsequent to the Subscriber Date" – or by February 9, 2003. NACEPF did not receive the Subscriber Information by that date. I did receive, on February 14, 2003, by Federal Express delivery, a document from Sprint Corporation (American's corporate parent) captioned "NACEPF Channel Lease Analysis – Sprint BWG." This document is attached hereto as Exhibit B.

13. I did not and would not understand Sprint's sending of the document captioned "NACEPF Channel Lease Analysis – Sprint BWG" to constitute the provision of the Subscriber Information referred to in paragraph B(b) of the Amendment. This is so for several reasons.

First, this document is the routine boilerplate form used to calculate and pay NACEPF its aggregate monthly lease payments and there was no cover letter accompanying the document that made reference to the Agreement or the Amendment or the expiration or renewal of the Amendment. Moreover, the "Channel Lease Analysis" is not specific to the Youngstown market at issue in the Agreement, and does not provide the Subscriber Information for the Youngstown channels as of the Subscriber Date (January 30, 2003), as required by paragraph B(b) of the Amendment. Instead, the "Channel Lease Analysis" presents general subscriber information for a number of different markets in which Sprint (or a subsidiary) was leasing excess capacity from NACEPF, and shows how Sprint calculated its monthly lease payment (in this case, $62,915.47) for all of these markets. NACEPF received a similar multi-market summary from Sprint every month.

14. Second, Section 21 of the Agreement specified that any notice required to be given to NACEPF had be delivered personally or by certified mail. The "Channel Lease Analysis" was not delivered personally or by certified mail, as required by the Agreement.

15. Third, Section 21 of the Agreement (in conjunction with the first paragraph of the Agreement) specified that any notice required to be given to NACEPF was to be delivered or sent to NACEPF at P.O. Box 40026, Providence, Rhode Island, or to 47 Meadowview Blvd., North Providence Rhode Island. The "Channel Lease Analysis" was not sent to either of these addresses.

16. NACEPF has never received the Subscriber Information for the Youngstown market as of the Subscriber Date (January 30, 2003).

17. NACEPF elected to renew the Agreement for the Additional Renewal Term (May 30, 2003 through April 30, 2008). This is shown by, inter alia, the fact that in December 2002

NACEPF submitted an application to the FCC to renew its license for the Youngstown market. NACEPF did the same thing with regard to the leases listed in paragraph 11.

18. From May through November (Ck# 8997667 dated 12/17/2003) 2003, there was no change in the relationship between NACEPF and American (or Sprint) insofar as the Agreement was concerned. Every month Sprint sent a check to NACEPF for the amount owed pursuant to the Agreement. Every month Sprint sent a "Channel Lease Analysis" detailing how Sprint calculated its monthly lease payment for the different markets (including Youngstown) in which it leased capacity from NACEPF. For this reason, I believed that Sprint understood that the Agreement had been renewed, and I made no efforts on behalf of NACEPF to find other users for NACEPF's excess capacity.

19. In December 2003, I received the letter attached hereto as Exhibit C from Jennifer L. Crowder, a Sprint representative. In this letter Sprint asserted, for the first time, that the Agreement had previously expired. Our records show that Sprint has not made any further payments we credited for November 2003.

20. As of October 31, 2005, American will owe NACEPF $67,375.31 pursuant to the Agreement. This is calculated as follows. As Exhibit D hereto reflects, under the Agreement American owed two basic fees to NACEPF: transmission fees and programming fees. The minimum monthly transmission fee was $1,000. The monthly programming fee was determined by multiplying the subscriber count (7,882) by .2. This equals $1,576.40 per month. As Exhibit D shows, the total of these components is $2,576.40 per month. Thus, from April 30, 2003 (the first day of the Additional Renewal Term) through October 31, 2005, American should have paid NACEPF $2,576.40 times 30 months, or $77,292. Instead, it only made seven payments of

$1,416.67. The shortfall is $67,375.31. Beginning November 1, 2005, American will owe $2,576.40 per month through April 30, 2008.

21. In other leasing agreements NACEPF has made with Sprint subsidiaries, NACEPF has renewed those agreements without giving notice of the renewal in any particular manner. For example, NACEPF has executed ITFS excess capacity airtime leases with Sprint subsidiaries for NACEPF's excess authorized spectrum capacity in Colorado Springs, Colorado; Fresno, California; Lansing, Michigan; Denver, Colorado; Santa Rosa, California; Columbus, Ohio; Seattle, Washington; and Yuba City, California. Like the Amendment at issue in this case, all of these agreements were amended by a Third Amendment effective as of May 30, 1997. The Third Amendments in the case of these other markets contained language identical to that contained in the Amendment (see, for example, the Third Amendment for Colorado Springs, Colorado, attached hereto as Exhibit B). In every one of these other leases, the number of subscribers as of the Subscriber Date was below the specified threshold. In every one of these other contracts, NACEPF exercised its right to renew the lease for an Additional Renewal Term without providing notice to the Sprint subsidiary, and in every case the subsidiary has continued to make its monthly payments. (The Additional Renewal Terms began on the following dates in these cities: Colorado Springs -- August 6, 2001; Fresno -- September 24, 2001; Lansing -- March 27, 2002; Danver -- April 10, 2002; Santa Rosa -- August 14, 2002; Columbus -- October 10, 2002; Seattle -- October 28, 2002; Yuba City -- June 30, 2005.)

22. NACEPF relied on the course of conduct established with Sprint and its subsidiaries in renewing the Amendment applicable to Youngstown. We followed exactly the same practice in renewing that Agreement in April 2003 as we had in renewing seven other ITFS excess capacity lease agreements with Sprint Subsidiaries in 2001 and 2002. Yet, for some reason nine

months after the Amendment became effective, Sprint (American) has taken a different position in the case of Youngstown, and has stopped making payments.

John Primeau

Sworn to before me this ______ day of October, 2005.

Notary Public
My Commission Expires: