**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.<br>Plaintiff,<br>v.<br><br>AMERICAN TELECASTING OF YOUNGSTOWN, INC.,<br>Defendant. | Case No. 04-473T |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant American Telecasting of Youngstown, Inc. ("<u>ATY</u>")[1] hereby objects to Plaintiff's motion for summary judgment, which should be denied in its entirety. Through its motion, Plaintiff North American Catholic Educational Programming Foundation, Inc. ("<u>NACEPF</u>") seeks a declaration that its so-called ITFS Excess Capacity Airtime Lease Agreement (the "<u>Agreement</u>" or "<u>Lease</u>") with ATY remains in force through April 30, 2008 and an award of damages in the amount of $67,375.31 with respect to payments allegedly due under the Agreement through October 31, 2005. NACEPF's motion must be denied on several grounds:

1. The Agreement expired on April 30, 2003, and was never renewed by NACEPF.

2. Several of the material facts upon which NACEPF relies are disputed, and with respect to NACEPF's damage claim, have no factual support in the record and are belied by NACEPF's own admissions.

---

[1] Sprint Corporation ("Sprint") was initially named as an additional defendant in this action. However, on August 16, 2005, Sprint was dismissed without prejudice by agreement of the parties. *Docket,* Entry No. 9.

3. NACEPF's motion fails to comply with this Court's Pretrial Order, dated May 12, 2005.

4. This Court lacks jurisdiction to hear and decide this matter; to a legal certainty, the amount at issue in this diversity action is less than $75,000.

In further support of this Objection, ATY submits herewith and hereby incorporates by reference *Defendant's Memorandum of Law in Support of its Objection to Plaintiff's Motion for Summary Judgment*, the *Affidavit of Jennifer Crowder*, *Defendant's Local Rule 12.1 Counterstatement*, and *Defendant's Appendix of Authorities and Cases.*

WHEREFORE, ATY respectfully requests that this Court deny NACEPF's motion in its entirety.

**AMERICAN TELECASTING OF YOUNGSTOWN, INC.,**
By its attorneys,

**BROWN RUDNICK BERLACK ISRAELS LLP**
Jennifer L. Brooks (Bar #6176)
Wayne F. Dennison (admitted *pro hac vice*)
121 South Main Street
Providence, RI 02903
(401) 276-2600
(401) 276-2601 Facsimile

Dated: November 15, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2005 I sent this document via first class mail, postage prepaid, to Mark A. Pogue, Esq., Edwards & Angell, LLP, 2800 Financial Plaza, Providence, RI 02903.

Jennifer L. Brooks

# 50219870 v1 - BROOKSJL - 080655/0097

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.,<br>Plaintiff,<br>v.<br><br>AMERICAN TELECASTING OF YOUNGSTOWN, INC.,<br>Defendant. | Case No. 04-473T |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant American Telecasting of Youngstown, Inc. ("ATY")[1] has objected to Plaintiff's motion for summary judgment. This memorandum is submitted in support of ATY's Objection. As detailed herein, Plaintiff's motion must be denied on several grounds:

1. The Agreement expired on April 30, 2003, and was never renewed by Plaintiff.
2. Several of the material facts upon which Plaintiff relies are disputed, belied by Plaintiff's own admissions or have no factual support in the record.
3. Plaintiff's motion fails to comply with this Court's Pretrial Order.
4. This Court lacks jurisdiction to hear and decide this matter; to a legal certainty, the amount at issue in this diversity action is less than $75,000.

WHEREFORE, ATY respectfully requests that Plaintiff's motion for summary judgment be denied in its entirety.

---

[1] Sprint Corporation ("Sprint") was initially named as an additional defendant in this action. On August 16, 2005, Sprint was dismissed without prejudice by agreement of the parties. *Docket,* Entry No. 9.

## TABLE OF CONTENTS

SECTION PAGE

I. DESCRIPTION OF MOTION AND OBJECTION ....2

II. FACTS ....2

A. The Initial Business Model ....2
B. Anticipating the Growth of the Business ....3
C. Subscriber Levels Decline. ....4
D. NACEPF's Response ....5
E. The Other Agreements ....5

III. ISSUES ....6

IV. POINTS AND AUTHORITIES ....7

A. NACEPF's Motion for Summary Judgment Should Be Denied ....7

1. Summary judgment standard. ....7
2. Factual disputes preclude a finding that NACEPF renewed the Lease ....7
3. The Lease requires NACEPF to inform ATY of its decision to exercise the Renewal Option ....9
4. Factual disputes preclude a finding in NACEPF's favor on its claim that it was not untimely ....10
   a. Timing and content ....12
   b. Place and manner of receipt ....13
5. Factual disputes preclude a finding in NACEPF's favor on its baseless claim that ATY is equitably estopped from denying the additional renewal ....15
6. NACEPF is estopped by its own judicial admissions with respect to its new damage claim ....17
7. NACEPF's motion fails to comply with this Court's Pretrial Order ....18
8. The amount in controversy is insufficient for federal jurisdiction ....18

V. CONCLUSION ....19

## I. DESCRIPTION OF MOTION AND OBJECTION

Through its motion, Plaintiff North American Catholic Educational Programming Foundation, Inc. ("NACEPF") seeks a declaration that its ITFS Excess Capacity Airtime Lease Agreement (the "Agreement" or "Lease") with ATY remains in force through April 30, 2008 and an award of damages against ATY in the amount of $67,375.31 with respect to payments allegedly due NACEPF under the Agreement through October 31, 2005.

ATY objects to the motion. The Agreement expired in April 2003 pursuant to its terms. Moreover, NACEPF has impermissibly claimed damages that are flatly inconsistent with its own judicial admissions.

## II. FACTS

### A. The Initial Business Model.

In the early 1990's, ATY's parent company, American Telecasting, Inc. ("AT"), sought to offer commercial wireless cable television service (known as Broadcast Wireless) in several metropolitan areas across the United States, including Youngstown, Ohio. *Affidavit of Jennifer L. Crowder* ("*Crowder Aff.*"), ¶ 4. In order to offer this service, AT, through various local subsidiaries, contracted with NACEPF to make use of NACEPF's excess capacity on certain broadcast frequencies. *Crowder Aff.*, ¶¶ 4 and 58.

AT bore all the risks and all expenses associated with the venture, which provided NACEPF with both monthly compensation and the potential to expand the reach of its own educational programming "at little or no additional cost." *Crowder Aff.*, ¶¶ 5-13. In the event that AT's wireless cable service proved to be successful, NACEPF would share in the growth of AT's business through subscriber-based royalty and programming fees. *Crowder Aff.*, ¶¶ 6, 12 and 13.

For use of its excess capacity, NACEPF was to be paid: 1) a monthly Transmission Fee ($1000 per month); 2) a Programming Fee ($5000 per year minimum, with additional payments later made dependent upon monthly subscriber levels); and 3) a monthly Subscriber Royalty Fee (again depending upon subscriber levels). *Agreement,* ¶¶ 6 (C and D) and 7 (B).

**B. Anticipating the Growth of the Business.**

In May 1997, NACEPF and twelve AT companies, including ATY, amended their agreements to tie the renewal of each agreement beyond its first five-year renewal term to marked growth (a doubling) in the number of Broadcast Wireless subscribers within the metropolitan market with which that agreement was concerned. *Crowder Aff.*, ¶¶ 20-22 and 58. Through a third amendment to the Lease between NACEPF and ATY, dated as of May 30, 1997, and drafted by NACEPF's counsel, *Crowder Aff.*, ¶ 17, paragraph 1(B) of the Lease was amended as follows:

> **<u>Renewal Term</u>.**
>
> (a) .... **It is acknowledged and agreed that Lessee shall have the absolute right not to renew this Agreement notwithstanding any provision hereof to the contrary.**
>
> (b) Unless terminated pursuant to any applicable provision of the Agreement, this Agreement shall automatically and without further notice be extended for an additional renewal term (the "Additional Renewal Term") of five (5) years, unless the number of Subscribers to Lessee's System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, **does not equal or exceed <u>7,882</u> (the number of Subscribers to Lessee's System as of January 31, 1997, multiplied by a factor of two (the "Subscriber Multiple")), in which event, the Agreement shall expire at the end of the Renewal Term** unless Lessor, at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option"). Lessee shall provide Lessor with the number of Subscribers to Lessee's System (the "Subscriber Information") as of the Subscriber Date no later than ten (10) days subsequent to the Subscriber Date. In the event the number of Subscribers to Lessee's System on the Subscriber Date does not equal or exceed the Subscriber Multiple and **unless Lessor exercises its Renewal Option within ten (10) days from receipt of the Subscriber Information, Lessor shall be deemed to have not exercised the**

> **Renewal Option and the Agreement shall expire at the end of the Renewal Term.**

*Third Amendment,* ¶ 1 (emphases added).[2]

### C. Subscriber Levels Decline.

Although the Third Amendment provides a subscription threshold of 7,882 subscribers for automatic renewal beyond the end of the first Renewal Term (April 30, 2003), since the Third Amendment was executed, the number of ATY's monthly subscribers has never exceeded 3,817. *Crowder Aff.*, ¶ 56. Rather than the growth contemplated by the parties in the Third Amendment, subscriber levels steadily declined throughout the entire Renewal Term. *Crowder Aff.*, ¶ 56. In fact, since September 2001, the number of monthly subscribers to ATY's wireless cable services has not exceeded 2,083 – the average monthly number of subscribers required if NACEPF is to be paid more than the $5,000 annual minimum Programming Fee. *Crowder Aff.*, ¶ 34.

On February 13, 2003, Sprint[3] sent NACEPF an analysis that, among other information, explicitly indicated that the average number of ATY subscribers for January 2003 was 1,616 (approximately one-fifth the 7,882 subscribers required to trigger an automatic renewal of the Agreement for the Additional Renewal Term). *Crowder Aff.*, ¶ 35. In January 2003, Sprint had reported to NACEPF similar subscription numbers (1,649 subscribers) for December 2002. *Crowder Aff.*, ¶ 36.

---

[2] The ellipsis reflects the omission of the following language: "[p]rovided Lessee's rights have not been terminated pursuant to Paragraph 9(a) [sic], this Agreement shall automatically and without further notice be extended for one (1) additional term (such additional term is hereinafter referred to as the "Renewal Term") of five (5) years unless and until Lessee shall have served written notice on Lessor at least sixty (60) days prior to the expiration date of the Initial Term that Lessee elects not to renew this Agreement for the Renewal Term." This automatic renewal provision now appears in several of the contracts between NACEPF and the AT subsidiaries. However, with respect to the Lease here at issue, the parties expressly agreed in a contemporaneously dated Lease amendment to "extend the Lease through the Renewal Term" and did not even amend the first clause of the foregoing language to refer to the appropriate paragraph in the Lease. *Second Amendment,* ¶ 3, p. 2.

[3] Sprint had acquired AT and its subsidiaries, including ATY, and had been reporting subscriber information and paying NACEPF on ATY's behalf since January 2000. *Crowder Aff.*, ¶ 23.

**D. NACEPF's Response.**

Upon receipt of ATY's subscriber information for January 2003, NACEPF did nothing to exercise the Renewal Option referenced in the Third Amendment. *Crowder Aff.*, ¶ 39. In fact, between February 2003 and December 2003, NACEPF did not contact Sprint or ATY with respect to the Lease and made no affirmative act known either to Sprint or to ATY to exercise the Lease's Renewal Option. *Crowder Aff.*, ¶ 40. Had NACEPF sought to exercise its Renewal Option upon receipt of the January 2003 subscriber information, Youngstown would have had the option to assert its "***absolute right not to renew*** th[e] Agreement notwithstanding any provision . . . to the contrary." *Third Amendment*, ¶ 1 (B)(a), p. 1 (emphasis added); *Crowder Aff.*, ¶ 41.

**E. The Other Agreements.**

In eight cities other than Youngstown, OH, Sprint wished to retain rights to NACEPF's excess capacity for the Additional Renewal Term despite the fact that the subscriber levels were below the minimum subscriber thresholds. *Crowder Aff.*, ¶ 58. In order to keep the other leases from expiring pursuant to their terms, in each of these eight cases, Sprint wrote NACEPF indicating that it would increase its payments to NACEPF and thereafter increased its Programming Fee payments to a level equal to that which would have been owed to NACEPF if the subscriber thresholds for automatic renewals had in fact been met. *Crowder Aff.*, ¶ 58.

Sprint began paying NACEPF on these eight contracts as if there were a sufficient number of subscribers to keep them from expiring. *Crowder Aff.*, ¶ 58. NACEPF was sent eight such letters (each to its 2419 Hartford Avenue, Johnston, RI address) between January 2002 and August 2002. *Crowder Aff.*, ¶ 58. Not one of these letters (nor any of the increased payments to NACEPF contemplated by them) was rejected by NACEPF. *Crowder Aff.*, ¶ 58. Because Sprint

intended to permit the Lease to simply expire by its terms, no letter was sent with respect to Youngstown. *Crowder Aff.*, ¶ 58.

Instead, following the April 30, 2003 expiration of the Lease, Sprint made month-to-month payments to NACEPF in an amount equal to the monthly Transmission Fee provided under the expired Lease and one-twelfth of the minimum annual Programming Fee. *Crowder Aff.*, ¶ 46. NACEPF accepted this amount without complaint or comment. *Crowder Aff.*, ¶ 47.

As of October 1, 2003, ATY made no commercial use of NACEPF's excess capacity and no longer had any subscribers to its wireless cable service. *Crowder Aff.*, ¶ 50. In December 2003, Sprint wrote to NACEPF and provided NACEPF notice that ATY no longer intended to make use of NACEPF's channels on a month-to-month basis, and that NACEPF would receive only two more checks. *Crowder Aff.*, ¶ 48. All told, following the last payment due NACEPF under the Lease, ATY made nine payments of $1416.67 (or $12,750.03) to NACEPF without objection. *Crowder Aff.*, ¶ 49.

## III. ISSUES

1. Whether the Lease expired in April 2003, given NACEPF's actual knowledge that the subscriber numbers were far below those required to automatically renew the Lease.

2. Whether the Lease expired in April 2003, given NACEPF's failure to take any affirmative action known to ATY to exercise its Renewal Option.

3. Whether the undisputed material facts of record support NACEPF's inconsistent claims that: 1) it renewed the Lease; 2) it was not required to provide notice of the renewal; 3) it was not untimely in its renewal irrespective of its failure to provide notice; and 4) ATY is somehow equitably estopped from denying a renewal of which it was provided with no notice.

4. Whether NACEPF is bound by its own judicial admissions with respect to its acceptance of payments from ATY.

5. Whether NACEPF is bound by this Court's Pretrial Order, dated May 12, 2005.

6. Whether the amount in controversy in this diversity case exceeds this Court's jurisdictional minimum.

## IV. POINTS AND AUTHORITIES

### A. NACEPF's Motion for Summary Judgment Should Be Denied.

#### 1. Summary judgment standard.

Summary judgment is warranted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is ***no*** genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added); *Stop & Shop Supermarket v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180, 185 (D.R.I. 2003). At summary judgment, the Court must view all evidence and related inferences in the light most favorable to the non-moving party. *Blue Cross & Blue Shield*, 239 F. Supp. 2d at 185 (*citing Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991)); *56 Associates v. Frieband,* 89 F. Supp. 2d 189, 191 (D.R.I. 2000); *Greater Providence MRI Ltd. Partnership v. Medical Imaging Network of S. New Eng., Inc.,* 32 F. Supp. 2d 491, 496 (D.R.I. 1999). "When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Greater Providence MRI,* 32 F. Supp. 2d at 496 (quoting *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995)).

The record here abounds with factual disputes as to whether the Lease was extended for the Additional Renewal Term. There is, however, no genuine dispute that NACEPF has overstated its damage claim by contradicting its own judicial admissions. NACEPF's motion for summary judgment should therefore be denied in its entirety.

#### 2. Factual disputes preclude a finding that NACEPF renewed the Lease.

NACEPF insists that "the evidence is undisputed that NACEPF exercised its option to renew the Agreement for the Additional Renewal Term." *NACEPF's Memo*, p. 7. In support of this contention, NACEPF exclusively relies on the assertion of its president, John Primeau

("Primeau") that "in December 2002, NACEPF submitted an application to the FCC to renew its license for the Youngstown market." *Affidavit of John Primeau* ("*Primeau Aff.*"), ¶ 17. However, NACEPF's FCC license renewal is simply irrelevant to whether NACEPF renewed ***the Lease.*** Moreover, the act identified by NACEPF as its exercise of the so-called Renewal Option predates the existence of that option by more than two months.

First, NACEPF's own lawyer admits that "[a]s of 2002 . . . NACEPF wished to renew [its] license" and that "NACEPF was required to make certain filings to preserve its FCC license, including the filing of the renewal application." *Affidavit of Howard J. Barr* ("*Barr Aff.*"), ¶¶ 4 and 5. According to Sprint's Jennifer Crowder, however, "[t]he fact that NACEPF chose to renew its own FCC license in December 2002 has no bearing on whether NACEPF intended to renew the Lease. Irrespective of whether the Lease with [ATY] was renewed, NACEPF was required to renew its own license with the FCC if it wished to retain that license." *Crowder Aff.*, ¶ 53. Crowder further states that "[t]here was nothing about NACEPF's December 2002 renewal request that would have suggested . . . that NACEPF also intended to renew the Lease when it expired some five months later. To the contrary, the Lease was, as Barr admits in ¶ 5, 'scheduled to expire on April 30, 2002 [sic],' at which time NACEPF would have needed its license both for its own purposes and in order to have been able to offer to lease its excess capacity to users other than [ATY]." *Crowder Aff.*, ¶ 54.

Second, the act that purportedly resulted in NACEPF's renewal of the Lease occurred more than two months prior to the time that its Renewal Option came into existence. Under the Third Amendment, NACEPF's Renewal Option did not even exist in December 2002. It was an option that depended on the number of subscribers in the following month. It is, of course, well-established that options must be exercised in strict accordance with their terms, that time is of the essence in options contracts, and that they are strictly construed against the party that is

exercising the option (here, NACEPF). 15 Richard A. Lord, *Williston on Contracts*, §46:12 (4th Ed. 2000).

Accordingly, NACEPF is not entitled to summary judgment on its claim that it exercised its option to renew the Lease.

**3. The Lease requires NACEPF to inform ATY of its decision to exercise the Renewal Option.**

NACEPF contends that it was not required to provide notice to ATY that it intended to exercise the Renewal Option. *NACEPF's Memo*, pp. 7-8. This contention is entirely nonsensical. Moreover, the sole support NACEPF provides for the contention is a provision of the Third Amendment that the parties expressly agreed not to employ.

In pertinent part, paragraph 1(B)(b) of the Third Amendment, provides:

> . . . unless Lessor exercises it Renewal Option within ten (10) days from receipt of the Subscriber Information, Lessor shall be deemed to have not exercised the Renewal Option and the Agreement shall expire at the end of the Renewal Term.

This language expressly contemplates that NACEPF must do something in order to "exercise" its option within a ten day period or it will be deemed not to have exercised the option. NACEPF has identified nothing that it allegedly did within ten days (or twenty, thirty, forty or fifty days) following receipt of ATY's subscriber information in February 2003.

NACEPF's performance obligations under the Lease were minimal, at best. *Crowder Aff.*, ¶¶ 6-11. Absent notice of NACEPF's intention to exercise the Renewal Option, ATY would have no reason to believe that the option had been exercised. Rather, it would reasonably conclude that the option was permitted to lapse as contemplated by the Lease. More important, unless NACEPF provides ATY with notice of its intention to exercise the Renewal Option, ATY could not then exercise its own "***absolute right not to renew*** th[e] Agreement notwithstanding

any provision . . . to the contrary." *Third Amendment*, ¶ 1 (B)(a), p. 1 (emphasis added); *Crowder Aff.*, ¶ 41.

NACEPF's suggestion that no notice of its exercise of the Renewal Option was required, because the Lease, in paragraph 1(B)(a), expressly provides that written notice must be given in other circumstances, and there is no express provision requiring notice with respect to the Renewal Option is similarly misguided. First, the written notice provision upon which NACEPF relies had no application with respect to the ATY Lease (as opposed to other agreements). The parties here expressly agreed to "extend the Lease through the Renewal Term" rather than make use of the automatic renewal provision that NACEPF references. *Second Amendment*, ¶ 3, p. 2.

In addition, the provision that NACEPF references does not concern the exercise of any right described as an option. Here, the reasonable intention of the parties with respect to NACEPF's Renewal Option requires notice to ATY or that, at least, some affirmative act reflecting NACEPF's decision to exercise the option be made known to ATY by NACEPF.[4]

**4. Factual disputes preclude a finding in NACEPF's favor on its claim that it was not untimely.**

Apparently unaware that this contention is inconsistent with its claim that it, in fact, exercised the Renewal Option, NACEPF next argues that as a matter of law it was not untimely in its exercise of the Renewal Option because the "ten-day exercise period never began to run." *NACEPF's Memo*, p. 8. NACEPF here misreads the Lease, misstates the applicable law and misleads this Court with respect to the facts.

As a preliminary matter, the Lease does not, as NACEPF suggests, make ATY's provision of the subscriber information a condition precedent to the expiration of the Lease.

---

[4] In footnote 1 of its memorandum, purportedly relying on ¶¶ 5 and 6 of the *Barr Aff.*, NACEPF claims that it provided Sprint with notice of its intention to exercise the Renewal Option, by sending it a copy of the December 2002 renewal application. Sprint has expressly denied, however, that this served as notice of NACEPF's intention to renew the Lease. *Crowder Aff.*, ¶¶ 53-54.

Where these parties intended to create conditions precedent in the Lease, they have done so explicitly. *See Agreement*, ¶ 20, pp. 35-36 (addressing FCC approval).

Instead, the Lease, through the Third Amendment, provided NACEPF with protection against being bound for an Additional Renewal Term (and with the ability to market its excess capacity to another user) if ATY had not doubled the number of its subscribers between January 1997 and January 2003. If NACEPF chose to keep the contract in place irrespective of ATY's failure to achieve its targeted growth, NACEPF could do so by exercising its Renewal Option (subject only to ATY's absolute right not to renew). *Third Amendment,* ¶ 1(B)(b). The reason for this provision is clear. NACEPF's compensation depended in large measure upon ATY's subscription levels.

The manner in which NACEPF, through its counsel, *Crowder Aff.*, ¶ 17,[5] chose to memorialize these concepts is with a single run-on sentence that contains three separate "unless" clauses. This sentence provides for the automatic renewal of the Lease if a 7,882 subscriber threshold was reached by the end of January 2003 and for the expiration of the Lease if it was not. *Third Amendment,* ¶ 1(B)(b).[6] This sentence is followed by a reporting requirement intended to provide NACEPF with notice of the subscriber levels. *Third Amendment,* ¶ 1(B)(b).[7]

---

5 "A contract is ambiguous [] when it is reasonably and clearly susceptible of more than one interpretation." *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.*, 852 A.2d 535, 541-542 (R.I. 2004) . "Where an ambiguity exists in a provision of a contractual document, the construction of that provision is a question of fact. Ambiguities in a contract must be construed against the drafter of the document." *Fryzel v. Domestic Credit Corp.*, 120 R.I. 92, 98-99 (1978) (internal citations omitted).

6 "**Unless** terminated pursuant to any applicable provision of the Agreement, this Agreement shall automatically and without further notice be extended for an additional renewal term (the "Additional Renewal Term") of five (5) years, **unless** the number of Subscribers to Lessee's System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, does not equal or exceed 7,882 (the number of Subscribers to Lessee's System as of January 31, 1997, multiplied by a factor of two (the "Subscriber Multiple")), in which event, the Agreement shall expire at the end of the Renewal Term **unless** Lessor, at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option") (emphasis added).

7 "Lessee shall provide Lessor with the number of Subscribers to Lessee's System (the "Subscriber Information") as of the Subscriber Date no later than ten (10) days subsequent to the Subscriber Date."

In turn, ATY's provision of this information to NACEPF triggers the ten-day period in which NACEPF was permitted to exercise its Renewal Option. *Third Amendment,* ¶ 1(B)(b).[8]

Here, NACEPF asserts that the Agreement never expired because it did not receive subscriber numbers reflecting the precise calculation expressed in the Lease, because the subscriber information provided to it was sent to the wrong address, and because it was not sent to NACEPF for ten business days (rather than ten calendar days) following the Subscriber Date referenced in the Third Amendment.

**a. Timing and content.**

As for NACEPF's timing argument, it is clearly established in Rhode Island that "ordinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that the breach of the time element will excuse nonperformance by the other party." *Safeway Sys., Inc. v. Manuel Bros., Inc.*, 102 R.I. 136, 145 (1967); *Fracassa v. Doris*, 814 A.2d 357, 362-363 (R.I. 2003). For a court to find that a provision was intended to make time of the essence, there "must be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." *Safeway Sys.*, 102 R.I. at 145.

NACEPF cannot meet this burden on the record before the Court and, without acknowledging the settled Rhode Island rule, merely cites to two inapposite cases from outside this jurisdiction. NACEPF does not and cannot even allege that the ten-day notice provision was material to its decision to execute the Third Amendment. There is, moreover, no way that the

---

8 "In the event the number of Subscribers to Lessee's System on the Subscriber Date does not equal or exceed the Subscriber Multiple and unless Lessor exercises its Renewal Option within ten (10) days from receipt of the Subscriber Information, Lessor shall be deemed to have not exercised the Renewal Option and the Agreement shall expire at the end of the Renewal Term."

ten-day provision or the alleged deviation in the content of the subscriber information (monthly average versus single day total) could be deemed material on these facts.

The undisputed and indisputable facts are that NACEPF knew with complete certainty for a period of years that ATY would never reach the minimum subscriber threshold by January 2003.[9] In fact, NACEPF had received reports reflecting declining subscriber counts and subscriber counts that were just a fraction of the 7,882 subscriber threshold in every month since the Third Amendment was executed in May 1997. *Crowder Aff.*, ¶¶ 35-37 and 56. In fact, by January and February 2003, NACEPF was being provided with average subscriber information for the ATY Lease reflecting subscriber numbers approximately one-fifth of the subscriber threshold contemplated in the Third Amendment. *Crowder Aff.*, ¶¶ 35 and 36.

**b. Place and manner of receipt.**

NACEPF cannot make any sincere allegation that it did not receive sufficient subscriber information to put it on notice of its right to exercise its Renewal Option. Instead, NACEPF argues that the subscriber information that it admittedly received should not count because it was sent by FedEx rather than provided by personal delivery or certified mail and because it was sent to NACEPF's street address rather than to its Post Office box or to Primeau's residence. NACEPF's contention with respect to the address to which the subscriber information was directed is, however, frivolous. Primeau requested that payment to NACEPF and that its supporting documentation be delivered to the address about which NACEPF now complains. *Crowder Aff.*, ¶ 28.

---

9 Although Primeau suggests that Sprint's reporting practices somehow kept him from understanding the meaning of the Lease analysis document that he was provided on a monthly basis, "[p]rior to bringing this suit, NACEPF never complained to Sprint about the practice of aggregating the amounts due NACEPF into a single monthly check, about the method by which subscriber information was reported in the NACEPF Channel Lease Analyses, about the manner in which these materials were sent to NACEPF by Sprint or about the address to which they were directed . . . ." *Crowder Aff.*, ¶ 30 and 55 (describing Primeau's suggestion as "preposterous").

NACEPF's "FedEx" complaint is similarly specious. Under Rhode Island law, "[e]ven where a contract requires a particular method of giving notice, notice given by a different method is effective if it is actually received unless the method by which notice is given is an essential element of the transaction." *University Emergency Med. Found. v. Rapier Invs., Ltd.*, 1998 U.S. Dist. LEXIS 22722, *5 (D.R.I. October 15, 1998), *aff'd*, 197 F.3d 18 (1st Cir. 1999). "Indeed courts have held that mailed termination notice is valid so long as it is actually received by the noticee, even where it is mailed to an incorrect address, or where the form of the mailing is technically defective." (internal citations omitted) *University Emergency Med. Found. v. Rapier Invs., Ltd.*, 197 F.3d at 22-23; *see also U.S. Broad. Co. v. National Broad. Co.,* 439 F. Supp. 8, 10 (D. Mass. 1977) ("[I]t is clear that plaintiff and plaintiff's counsel timely received both notices and it would be 'hypertechnical in the extreme' to hold that notice actually received was ineffective").

Additionally, there is a well recognized distinction between contract terms intended as conditions, the non-occurrence of which prevents a party from exercising a right (or relieves the other party from a duty), and terms intended merely to enhance the convenience of the transaction. *Univ. Emergency Med. Found.*, 197 F.3d at 12, n.7 (citing Farnsworth, Contracts §8.4, at 579-81). In *University Emergency*, the court found that a notice provision specifying the particular address to where notice must be sent was "merely a collateral term intended to enhance the probability that nailed [sic] notice will arrive promptly in the proper hands" and did not require strict compliance. *Id.* at 13. Likewise, the Lease provision stipulating that notice "shall be delivered personally or by certified mail to the Lessor at the address first written above" was simply a term of convenience.

**5. Factual disputes preclude a finding in NACEPF's favor on its baseless claim that ATY is equitably estopped from denying the additional renewal.**

NACEPF argues that ATY should be equitably estopped from claiming that the Lease was not renewed and claims that "it is well-settled that a course of conduct between two parties can provide the basis for invoking the equitable estoppel doctrine." *NACEPF's Memo*, p. 10. This argument is a red herring at best, in part, because NACEPF grossly misstates the parties' course of dealing. In fact, the course of conduct here belies NACEPF's claim.

In Rhode Island, "course of dealing" may be considered in order to determine the intent of the parties where the contract is ambiguous as to what the party intended. *See Minor v. Narragansett Mach. Co.*, 42 A.2d 711, 715 (R.I. 1945) ("When the entire course of dealing between the parties ... is taken into consideration, it is quite evident that ... when taken as a whole, [it] solves the question as to the duration of the contract."). However, ambiguities in a contract cannot be resolved on summary judgment. *See Den Norske Bank As v. First Nat'l Bank of Boston,*75 F.3d 49, 53 (1st Cir 1996); *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.,* 852 A.2d 535, 541-42 (R.I. 2004).

To the extent that the contract is ambiguous with respect to its intention for ATY's provision of the subscriber information, the course of conduct establishes: 1) that the NACEPF Channel Lease Analysis provided to NACEPF by Sprint contained notice of subscriber counts that the parties deemed adequate for purposes of the Additional Renewal Term provisions of the Third Amendment; and 2) that NACEPF had ample reason to know that the Lease would expire unless NACEPF attempted to exercise its Renewal Option.

Twelve separate leases (inclusive of the ATY Lease) were amended by the parties as of May 30, 1997. *Crowder Aff.*, ¶ 58. In eight of those cases, including six referenced by Primeau as having been renewed "follow[ing] exactly the same practice" as that at issue here, Sprint wished to retain rights to NACEPF's excess capacity for the Additional Renewal Term despite the fact

that the subscriber levels were below the minimum subscriber thresholds. *Id.* In order to keep the leases from expiring pursuant to their terms, in each of these eight other cases, Sprint wrote NACEPF after the "Subscriber Date" (in one case more than a month after the Subscriber Date) indicating that it would increase its payments to NACEPF and thereafter increased its Programming Fee payments to a level equal to that which would have been owed to NACEPF if the subscriber threshold for automatic renewal had, in fact, been reached. *Id.* NACEPF never complained about any alleged inadequacy of the subscriber count; nor did it complain about the dates upon which the subscriber count information or notice letters were received. *Id.* Because Sprint intended to permit that Lease to simply expire by its terms, no such letter was sent to NACEPF with respect to Youngstown. *Id.*

This course of conduct directly contradicts that alleged by Primeau and provides no support for NACEPF's construction of the Lease or equitable estoppel claim.[10] As important, NACEPF has not even alleged what affirmative representation ATY made to induce NACEPF to act or what detriment NACEPF suffered in so acting. NACEPF may now intend to allege that it chose not to exercise its Renewal Option because it continued to receive payments from ATY following the expiration of the contract. However, rather than indicating that the Lease had been renewed, those payments (which unlike the payments NACEPF was receiving with respect to the eight other leases were not increased by ATY but remained the same) reflect the fact that Sprint was not treating the ATY Lease in the same manner as it was the other leases. NACEPF voiced no complaint about this until December 2003, when it was informed by Sprint that ATY was no

[10] The cases to which NACEPF cites – *Shea v. Gamco, Inc.*, 98 A.2d 864 (R.I. 1953) and *Martines v. Terminal Methods, Inc.*, 225 A.2d 790 (R.I. 1967) – are workers' compensation cases and are neither controlling, nor even persuasive, on whether the Lease was renewed for an additional five-year term. *Shea* concerned whether an insurer was estopped from asserting that a claimant had failed to formally notify her employer of an accident or to comply with the Workers' Compensation statute based on certain actions taken by the insurer with respect to the claim. *See Shea*, 98 A.2d at 864, 867. *Martines* involved a similar issue. *See Martines*, 225, A.2d at 792.

longer intending to make use of NACEPF's capacity on a month-to-month basis. *Crowder Aff.*, ¶ 48.[11]

Accordingly, NACEPF is not entitled to summary judgment on its course of conduct or equitable estoppel claim.

**6. NACEPF is estopped by its own judicial admissions with respect to its new damage claim.**

NACEPF now claims damages for the Additional Renewal Term arguing that it was entitled to be paid during that period as if ATY had 7,882 subscribers. The amount due NACEPF employing this calculation greatly exceeds the monthly amounts paid to NACEPF after the expiration of the Lease. In its Complaint, however, NACEPF admits that "Sprint continued to pay NACEPF ***the amounts due under the Amendment*** through January 2004," that "Sprint made ***at least nine monthly payments to NACEPF pursuant to the Agreement***," and that "NACEPF accepted all of Sprint's payments." *Complaint,* ¶¶ 14 and 17 (emphases added). These admissions are directly at odds with the calculation of alleged damages now reflected in Primeau's affidavit. NACEPF must, however, be bound by its prior admissions. *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58 (1st Cir. 1992) ("a party's assertion of fact in a pleading is a judicial admission by which it is normally bound throughout the course of the proceeding.").

Moreover, summary judgment is inappropriate given that the parties are in direct dispute with respect to the amounts paid to date, the number of payments to be credited against the total allegedly due and the manner in which the total claimed by NACEPF is calculated. *Crowder Aff.*, ¶¶ 49 and 56.

---

[11] Any argument that ATY's additional monthly payments resulted in a five-year renewal of the Lease fails to comport with Rhode Island law. *See e.g. Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car Co.*, 871 A.2d 944, 949 (R.I. 2005); *Mahon v. Director of Pub. Works*, 204 A.2d 197, 199 (R.I. 1964); *State v. Kemalian Realty, Inc.*, 705 A.2d 999, 1000 (R.I. 1997) (*quoting Bibby's Refrigeration, Heating & Air Conditioning v. Salisbury*, 603 A.2d 726 (R.I. 1992)).

**7. NACEPF's motion fails to comply with this Court's Pretrial Order.**

NACEPF's submission to this Court fails to comply with the formatting requirements set forth in this Court's Pretrial Order, dated May 12, 2005. NACEPF fails to set forth the "statute, rule or other provision of law" on which the motion is based, and fails to include (i) an appendix of cases and authorities; (ii) a table of contents, (iii) a section entitled "Description of Motion"; (iv) a section entitled "Facts"; (v) a section entitled "Issues"; and (vi) a section entitled "Points and Authorities."

This Court has not hesitated to deny a motion for summary judgment where the proponent of the motion fails to comply with the Court's Local Rules and procedural mandates. *See Billings & Co. v. Pine Street Realty Assoc. Ltd. Partnership*, 754 F. Supp. 10 (D.R.I. 1990).

**8. The amount in controversy is insufficient for federal jurisdiction.**

NACEPF's judicial admissions in its Complaint with respect to the amount, number and adequacy of the payments made to it following and during the period of the alleged Additional Renewal Term are also important from a jurisdictional perspective. If NACEPF is bound by its judicial admissions, the total value of the Additional Renewal Term is $85,000.20 (60 payments of $1416.67) of which NACEPF has admitted it has already received at least $12,750.03. *Crowder Aff.*, ¶ 56; *Complaint,* ¶¶ 14 and 17.

Although NACEPF may argue that its claim for attorney fees under Rhode Island General Laws § 9-1-45 raises the amount in controversy over the jurisdictional minimum, this argument fails as a matter of law. Attorney fees are generally excluded in determining the amount in controversy, except where fees are provided for by contract, or where a statute mandates or allows the payment of such fees. *See Velez v. Crown Life Ins. Co.*, 599 F.2d 471 (1st Cir. 1979). Under R.I. Gen. Laws § 9-1-45, only where the Court: "(1) [f]inds that there

was a complete absence of a justiciable issue of either law or fact raised by the losing party; or (2) [r]enders a default judgment against the losing party" are fees to be awarded.

This Court (Pettine, J.) has considered the potential award of fees under R.I. Gen. Laws § 9-1-45, and held that the potential fee award should count toward the amount in controversy unless "a court can, on the basis of the pleadings, find the complaint or the opposition thereto completely meritless." *Billings*, 754 F. Supp. at 13-14 (D.R.I. 1990). Although Judge Pettine's decision reflects what was once considered the prevailing view, a year after *Billings*, the First Circuit ruled in favor of dismissal on jurisdictional grounds when confronted with a discretionary statute similar to § 9-1-45. The Court held that attorney fees were not properly includable in the jurisdictional amount where the plaintiff failed to contend in either "its complaint, proofs or brief on appeal that its situation fell within the meaning of the rule . . . . " *Department of Recreation and Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 89 (1st Cir. 1991). Because the plaintiff failed to provide a factual basis to support an award of fees, or to include on the record an estimate of such fees, the court held there was no basis on which the court could conclude that the jurisdictional amount had been met. *See id.* at 90. Here, except for a bare request in its Complaint for attorney fees pursuant to R.I. Gen. Laws § 9-1-45, NACEPF has not alleged any facts supporting an award of fees, nor has NACEPF provided an estimate of such fees. Accordingly, it is clear to a legal certainty that NACEPF's claim involves less than the jurisdictional amount.

## V. <u>CONCLUSION</u>

NACEPF's motion for summary judgment should therefore be denied in its entirety.

Respectfully submitted,

**AMERICAN TELECASTING OF YOUNGSTOWN, INC.,**
By its attorneys,

**BROWN RUDNICK BERLACK ISRAELS LLP**
Jennifer L. Brooks (Bar #6176)
Wayne F. Dennison (admitted *pro hac vice*)
121 South Main Street
Providence, RI 02903
(401) 276-2600
(401) 276-2601 Facsimile

Dated: November 15, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2005 I sent this document via first class mail, postage prepaid, to Mark A. Pogue, Esq., Edwards & Angell, LLP, 2800 Financial Plaza, Providence, RI 02903.

Jennifer L. Brooks

# 50219868 v2 - BROOKSJL - 080655/0097