**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.<br>Plaintiff,<br>v.<br><br>AMERICAN TELECASTING OF YOUNGSTOWN, INC.,<br>Defendant. | ) | Case No. 04-473T |

# DEFENDANT'S LOCAL RULE 12.1 COUNTERSTATEMENT

Pursuant to Local Rule 12.1(a)(2) and this Court's Pretrial Order, dated May 12, 2005, defendant American Telecasting of Youngstown, Inc. ("ATY" or "Youngstown") hereby submits its counterstatement of facts to which ATY contends there is a genuine issue necessary to be litigated.

## I. Material Facts in Dispute

The following material facts cited by NACEPF in its Local Rule 12.1 Statement are disputed by ATY:[1]

13. The renewal policy for an additional five-year term from April 30, 2003 through April 30, 2008 is contained in Paragraph (B)(b) of the [Lease] Amendment. Amendment, ¶ B(b).

**Paragraph 1 B(b) of the Lease Amendment provides for only some of the terms of the Agreement governing further renewal of the Lease. NACEPF fails to**

[1] For the convenience of the Court, the allegations from NACEPF's Local Rule 12.1 Statement that ATY disputes are individually set forth below in plain text and are immediately followed in **bold** by the bases upon which they are disputed by ATY.

**reference the final line of Paragraph 1 B(a), providing that "[i]t is acknowledged and agreed that [ATY] shall have the absolute right not to renew this Agreement notwithstanding any provision to the contrary."** ***Amendment*, ¶ 1 B(a).**

14. Paragraph B(b) does not specify the manner in which NACEPF should give notice to [ATY] in the event that NACEPF elected to renew the Agreement for the additional five-year term. Amendment, ¶ B(b).

**Paragraph 1 B(b) of the Lease Amendment expressly provides that the Agreement will "expire at the end of the [first] Renewal Term unless [NACEPF] . . . elects to renew the Agreement for the Additional Renewal Term (the 'Renewal Option')" and that "unless [NACEPF] exercises its Renewal Option within ten (10) days from receipt of the Subscriber Information, [NACEPF] shall be deemed to have not exercised the Renewal Option and the Agreement shall expire at the end of the Renewal Term."** ***Amendment*, ¶ 1 B(b); *Affidavit of Jennifer L. Crowder* ("*Crowder Aff.*"), ¶ 22.**

15. As required by the Amendment, [ATY] was to have provided certain Subscriber Information to NACEPF by February 9, 2003. The Subscriber Information was supposed to set forth the number of subscribers to [ATY]'s system in Youngstown as of January 30, 2003. Primeau Aff., ¶ 12.

**The Agreement does not specify whether the subscriber information is to be provided in ten calendar days or in ten business days. NACEPF was sent the subscriber information for January 2003 to NACEPF within ten business days.** ***Crowder Aff.*, ¶ 35.**

16. NACEPF never received the Subscriber Information. Primeau Aff., ¶ 16.

**NACEPF received subscriber information for January 2003 and had received subscriber information in a similar form since January 2000. *Crowder Aff.*, ¶¶ 23-26, 30 and 35.**

18. The Channel Lease Analysis was not sent to the address for NACEPF specified in the Agreement. Primeau Aff., ¶ 15.

**The Channel Lease Analysis was sent at John Primeau's request by Overnight Mail (FedEx) to NACEPF's business address rather than to Primeau's residence, the Overnight Mail address provided in the Agreement. *Crowder Aff.*, ¶¶ 28-29.**

19. The Channel Lease Analysis was not accompanied by a cover letter, nor was any reference made in it to the Agreement, the Amendment, or the expiration or renewal of the Amendment. Primeau Aff., ¶ 13.

**The Agreement does not require a cover letter or reference to the Agreement or to expiration or renewal of the Agreement when providing the subscriber information. NACEPF had accepted subscriber information in the same form for years. *Crowder Aff.*, ¶¶ 23-26, 30.**

20. The Channel Lease Analysis did not contain the Subscriber Information for the Youngstown channels as of the Subscriber Date of January 30, 2003, nor was it specific to the Youngstown market at issue in the Agreement. Primeau Aff., ¶ 13.

**The Channel Lease Analysis contains a line that is clearly marked "Youngstown" and provides ATY's subscriber numbers for January 2003 as 1,616 (a fraction of the number required for automatic renewal of the Agreement). *Crowder Aff.*, ¶ 35.**

21. The Channel Lease Analysis presented general subscriber information for 20 different markets in which Sprint or one of its subsidiaries was then leasing excess capacity from NACEPF, and showed how Sprint calculated its monthly lease payments for all of these markets. Primeau Aff., ¶ 13.

**The Channel Lease Analysis provided specific subscriber information that was used in determining the payments due NACEPF. ATY's subscriber information was separately presented from than of the other markets. *Crowder Aff.*, ¶¶ 25-26, 35.**

22. NACEPF elected to renew the Agreement for the Additional Renewal Term from April 30, 2003 through April 30, 2008. Primeau Aff., ¶ 17.

**NACEPF did not elect to renew the Agreement for the Additional Renewal Term from April 30, 2003 through April 30, 2008. It did nothing known to Sprint or ATY to cause the further renewal of the Agreement. *Crowder Aff.*, ¶ 39. Because NACEPF did not exercise its Renewal Option with ten days, the Agreement expired on April 30, 2003. *Crowder Aff.*, ¶ 43.**

25. Included in the application was information that Sprint had provided to Mr. Barr that was needed by NACEPF to submit its application to the FCC. Barr Aff., ¶ 6.

**The information requested of Sprint by NACEPF was minimal and was required of NACEPF by the FCC irrespective of whether it exercised the Renewal Option. *Barr Aff.*, Exhibit B; *Crowder Aff.*, ¶¶ 53-54.**

27. From April through December 2003, Sprint continued to send a check to NACEPF each [sic] pursuant to the Agreement. Primeau Aff., ¶ 18.

**Following expiration of the Agreement, Sprint sent NACEPF a total of nine checks to compensate NACEPF for ATY's minimal month-to-month use of NACEPF's excess capacity. No formal agreement between ATY and NACEPF was, however, in place. *Crowder Aff.*, ¶¶ 44, 49 and 56.**

28. From April through December 2003, Sprint continued to send monthly Channel Lease Analyses detailing how Sprint calculated its (monthly) lease payment for the different markets in which it leased capacity from NACEPF. Primeau Aff., ¶ 18.

**ATY continued to send monthly Channel Leases Analyses reflecting the amounts it was paying to NACEPF. Some but, not all of these payments, were pursuant to leases. *Crowder Aff.*, ¶ 49.**

29. In December 2003, Sprint informed NACEPF, for the first time, that it [sic]considered the Agreement to have expired. Primeau Aff., ¶ 19.

**In December 2003, Sprint sent a letter to NACEPF indicating that it would provide one additional payment in January 2004 for ATY's month-to-month use of NACEPF's excess capacity. *Crowder Aff.*, ¶ 48.**

30. American made payments under the Agreement through January 2004, but has made no further payments. Primeau Aff., ¶ 19.

**Payments were made by Sprint through into January 2004, but not under the Agreement. The Agreement expired in April 2003. *Crowder Aff.*, ¶¶ 43 and 49.**

31. As of October 1, 2005, American owed NACEPF $64,541.97 pursuant to the Agreement. Primeau Aff., ¶ 21.

**ATY owes NACEPF nothing. The number presented in paragraph 31, above, does not comport with NACEPF's own admissions. *Complaint*, ¶¶14 and 17.**

**Moreover, NACEPF's calculation of damages is wrong in several other respects. *Crowder Aff.*, ¶ 56.**

32. American continues to owe NACEPF $2,576.40 per month under the Agreement until it expires on April 30, 2008.

**ATY owes NACEPF nothing. The number presented in paragraph 32, above, does not comport with NACEPF's own admissions. *Complaint,* ¶¶14 and 17. Moreover, NACEPF's calculation of damages is wrong in several other respects. *Crowder Aff.*, ¶ 56.**

33. In other leasing agreements NACEPF has made with Sprint subsidiaries, NACEPF has renewed those agreements without giving notice of the renewal in any particular manner. For example, NACEPF has executed ITFS excess capacity airtime leases with Sprint subsidiaries for NACEPF's excess authorized spectrum capacity in Colorado Springs, Colorado; Fresno, California; Lansing, Michigan; Denver, Colorado; Santa Rosa, California; Columbus, Ohio; Seattle, Washington; and Yuba City, California. Like the Amendment at issue in this case, all of these agreements were amended by a Third Amendment effective as of May 30, 1997. The Third Amendments in the case of these other markets contained language identical to that contained in the Amendment. In every one of these other leases, the number of subscribers as of the Subscriber Date was below the specified threshold. In every one of these other contracts, NACEPF exercised its right to renew the lease for an Additional Renewal Term in the same manner it did in the case of the Agreement, has continued to make its monthly payments. (The Additional Renewal Terms began on the following dates in these cities: Colorado Springs -- August 6, 2001; Fresno -- September 24, 2001; Lansing -- March 27, 2002; Denver -- April 10,

2002; Santa Rosa -- August 14, 2002; Columbus -- October 10, 2002; Seattle -- October 28, 2002; Yuba City -- June 30, 2005.)

**The other agreements that NACEPF references were not renewed in the manner NACEPF claims the Agreement with ATY was renewed. In the bulk of these cases, as well as two others that NACEPF omits from its list, Sprint kept the agreements from expiring by agreeing in writing to provide additional compensation to NACEPF and by thereafter paying NACEPF as if the applicable subscriber thresholds had been met. With respect the Yuba City, CA contract, NACEPF purported to renew through a formal request made by Primeau in writing. *Crowder Aff.*, ¶¶ 58-59.**

34. NACEPF relied on the course of conduct established with Sprint and its subsidiaries in renewing the Amendment applicable to Youngstown. It followed exactly the same practice in renewing that Agreement in April 2003 as it had in renewing seven other ITFS excess capacity lease agreements with Sprint Subsidiaries in 2001 and 2002.

**The other agreements that NACEPF references were not renewed in the manner NACEPF claims the Agreement with ATY was renewed. In the bulk of these cases, as well as two others that NACEPF omits from its list, Sprint kept the agreements from expiring by agreeing in writing to provide additional compensation to NACEPF and by thereafter paying NACEPF as if the applicable subscriber thresholds had been met. With respect the Yuba City, CA contract, NACEPF purported to renew through a formal request made by Primeau in writing. *Crowder Aff.*, ¶ 58-59.**

## II. Additional Facts Precluding Summary Judgment

1. The Lease with NACEPF was executed in December 1991. At that time, AT sought to offer Broadcast Wireless (commercial wireless cable television service) in several metropolitan areas across the United States, including Youngstown, Ohio. *Crowder Aff.*, ¶ 4.

2. As a basis for executing the Lease, NACEPF "determined that by combining its educational programming with [Youngstown's] commercial programming, a significant increase may be achieved in the number of persons who will have access to [NACEPF's] educational programming ***at little or no additional cost***" to NACEPF. *Agreement*, Preamble, p. 2 (emphasis added); *Crowder Aff.*, ¶ 6.

3. With the exception of using "its best efforts to obtain receive sites and to obtain and maintain in force all licenses, permits and authorizations required for [Youngstown] and [NACEPF] to use the ITFS Channel as contemplated by th[e] Agreement," NACEPF's obligations under the Lease were minimal. *Agreement*, ¶8 (B), p. 25; *Crowder Aff.*, ¶ 7.

4. For example, Youngstown, rather than NACEPF, was to bear the expense associated with obtaining such "licenses, permits and authorizations." *Agreement*, ¶8 (B), p. 25; *Crowder Aff.*, ¶ 8.

5. Youngstown was also to pay "all costs and expenses incident to fulfilling th[e] Agreement." *Agreement*, ¶ 24, p. 36; *Crowder Aff.*, ¶ 9.

6. Similarly, under the Lease, Youngstown was to bear the entire costs of leasing the transmission site and of purchasing and installing "such transmitters, transmission line, modulators, antennas and other equipment as required to operate the

ITFS Channels . . . ." *Agreement*, ¶¶ 3 (A) and (B), pp. 12-13. This equipment was then to be leased to back to NACEPF at a nominal cost ($1.00 per year) and NACEPF was charged a nominal maintenance fee (again, $1.00 per year). *Agreement*, ¶¶ 3 (B) and (C), pp. 13-14; ¶ 5 (A), p. 17; and Exhibits C and D, pp. 41-42; *Crowder Aff.*, ¶ 10.

7. Ultimately, NACEPF bore "no responsibility for the loss of or damage to the Leased Equipment . . ." and bore no responsibility for any of the insurance costs associated with the Lease. *Agreement*, ¶ 5 (A), p. 17 and ¶ 14 (A), p. 32; *Crowder Aff.*, ¶ 11.

8. The Lease initially contemplated that NACEPF was to be compensated through a flat $1,000 per month Transmission Fee, a $5,000 per year Programming Fee, and, for those months in which there were in excess of ten-thousand (10,000) monthly subscribers to Youngstown's wireless cable service, a $0.10 per month per subscriber Subscriber Royalty Fee. *Agreement*, ¶¶ 6 (B) and (C), p. 18, ¶ 7 (B), p. 21 and Exhibit D, p. 42; *Crowder Aff.*, ¶ 12.

9. Through a second amendment to the Lease ("Second Amendment"), dated as of May 30, 1997, the annual Programming Fee was changed to require payment to NACEPF of the greater of "five thousand dollars ($5,000.00) or the monthly subscriber fee of twenty (.20) [sic] per subscriber." *Second Amendment*, (attached to *Crowder Aff.* as Exhibit A), ¶ 1 (B), p. 1. "All computations of programming fees [were to] be based upon the average number of subscribers to [Youngstown's] pay television service . . . . " *Id. Crowder Aff.*, ¶ 13.

10. In the Second Amendment, Youngstown and NACEPF expressly agreed that the "Initial Term [of the Agreement] commenced as of April 30, 1993 . . . ." *Second*

*Amendment*, Preamble, p. 1. The parties further agreed to "extend the Lease through the Renewal Term." *Second Amendment*, ¶ 3, p. 2. Pursuant to the Second Amendment, the Renewal Term was to extend for five years and to commence as April 30, 1998. *Id.*, at Preamble, p. 1; *Crowder Aff.*, ¶ 15.

11. Like the Second Amendment, the Third Amendment was drafted by NACEPF's counsel, Howard J. Barr ("Barr"). Both amendments bear Barr's initials on their final pages. *Crowder Aff.*, ¶ 17.

12. The Third Amendment also amends the Lease to expressly provide that "[i]t is acknowledged and agreed that [Youngstown] shall have the ***absolute right not to renew this Agreement*** notwithstanding any provision hereof to the contrary." *Third Amendment*, ¶ 1 (B)(a), p. 1 (emphasis added); *Crowder Aff.*, ¶ 19.

13. The Third Amendment also expressly provides for the expiration of the Agreement at the conclusion of the Renewal Term. *Third Amendment*, ¶ 1 (B)(a), pp. 1-2; *Crowder Aff.*, ¶ 20.

14. Under the Third Amendment, if "the number of Subscribers to [Youngstown's] System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, does not equal or exceed 7,882 . . . the Agreement shall expire at the end of the Renewal Term unless [NACEPF], at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option)." *Third Amendment*, ¶ 1 (B)(a), pp. 1-2; *Crowder Aff.*, ¶ 21.

15. NACEPF was provided ten days from the receipt of the Subscriber Information in which to "exercise[] its Renewal Option" and was "deemed to have not

exercised the Renewal Option" unless it did so within ten days. *Third Amendment*, ¶ 1 (B)(a), p 2.; *Crowder Aff.*, ¶ 22.

16. Since January 2000, Sprint has provided a check to NACEPF that aggregates payments due NACEPF under the agreements between NACEPF and several former AT subsidiaries, including Youngstown. *Crowder Aff.*, ¶ 23.

17. Along with the check, Sprint provides a break-out by contract of the average number of subscribers in each of several clearly designated municipalities, including Youngstown, Ohio. *Crowder Aff.*, ¶ 24.

18. This monthly reporting tool was captioned "NACEPF Channel Lease Analysis – Sprint BWG" and, as its caption suggests, provides Sprint Broadcast Wireless Group ("BWG")'s analysis of the monthly payments due NACEPF under the various leases. (The January 2003 NACEPF Channel Lease Analysis is attached to the *Crowder Aff.* as Exhibit B); *Crowder Aff.*, ¶ 25.

19. Sprint provided (and, with respect to some of the other agreements, continues to provide) this information to NACEPF because NACEPF's compensation under the Youngstown (and other) leases depended, in part, on the number of wireless cable subscribers served. *Crowder Aff.*, ¶ 26.

20. The NACEPF Channel Lease Analyses also expressly provided an address at Sprint and a telephone number to which "inquiries" could be directed by NACEPF. *Crowder Aff.*, ¶ 27.

21. At the request of John Primeau ("Primeau"), NACEPF's president, both the monthly check and the NACEPF Channel Lease Analysis were and are routinely sent

by Federal Express or other Overnight Mail and directed to NACEPF's offices at 2419 Hartford Avenue, Johnston, RI. *Crowder Aff.*, ¶ 28.

22. Prior to bringing this suit, NACEPF never complained to Sprint about the practice of aggregating the amounts due NACEPF into a single monthly check, about the method by which subscriber information was reported in the NACEPF Channel Lease Analyses, about the manner in which these materials were sent to NACEPF by Sprint or about the address to which they were directed at Primeau's request. *Crowder Aff.*, ¶ 30.

23. With respect to the Lease with Youngstown, both the Programming Fee and the potential Subscriber Royalty Fee are directly dependent on the number of subscribers to Youngstown's wireless cable services. *Crowder Aff.*, ¶ 31.

24. Given that the Programming Fee is to be the greater of $5,000 annually or twenty cents ($0.20) per month per subscriber, Youngstown is obligated to pay NACEPF a per subscriber Programming Fee only if the annual number of monthly subscribers exceeds 25,000 (or, on average, 2,083 subscribers per month). *Crowder Aff.*, ¶ 33.

25. Since September 2001, the number of monthly subscribers to Youngstown's services has never exceeded 2,083. Accordingly, from September 2001 through the end of the Renewal Term of the Lease, Sprint provided NACEPF with monthly Programming Fee payments of $416.67, an amount that is one-twelfth of the annual minimum Programming Fee payment of $5,000. *Crowder Aff.*, ¶ 34.

26. On February 13, 2003, ten business days following the Subscriber Date referenced in the Third Amendment, Sprint sent NACEPF an analysis that, among other information, explicitly indicated that the average number of Youngstown subscribers for January 2003 was 1,616 (approximately one-fifth the 7,882 subscribers required to

trigger an automatic renewal of the Agreement for the Additional Renewal Term). *Crowder Aff.*, ¶ 35.

27. Since the execution of the Third Amendment (or of the Agreement), the number of monthly Youngstown subscribers has never approached the 7,882 subscribers required to trigger automatic renewal for the Additional Renewal Term. *Crowder Aff.*, ¶ 37.

28. Upon receipt of the Youngstown subscriber information for January 2003, NACEPF did nothing to exercise the Renewal Option referenced in the Third Amendment. *Crowder Aff.*, ¶ 39.

29. Between February and December 2003, NACEPF did not contact Sprint or Youngstown with respect to the Lease and made no affirmative act made known either to Sprint or to Youngstown to effect the exercise of the Renewal Option; *Crowder Aff.*, ¶ 40.

30. By February 2003, neither Youngstown nor Sprint expected to provide wireless cable ***television*** service in the Youngstown, Ohio area through April 2008. However, Sprint had made public its intention to develop a wireless broadband ***data*** service and had attempted to renegotiate its leases with NACEPF (including the Youngstown Lease) to accommodate this alternative use. *Crowder Aff.*, ¶ 42.

31. On April 30, 2003, the Lease expired pursuant to the terms of Third Amendment. *Crowder Aff.*, ¶ 43.

32. Youngstown thereafter continued to provide payment on a month-to-month basis for its minimal use of NACEPF's ITFS excess capacity. *Crowder Aff.*, ¶ 44.

33. After the April 30, 2003 expiration of the Lease, NACEPF and Youngstown no longer had a formal agreement with respect to the nature of Youngstown's minimal use of NACEPF's excess capacity. *Crowder Aff.*, ¶ 45.

34. Nevertheless, Sprint on behalf of Youngstown made payments in an amount equal to the monthly Transmission Fee provided under the expired Lease and one-twelfth of the minimum annual Programming Fee. *Crowder Aff.*, ¶ 46.

35. NACEPF accepted this amount, $1416.67, without complaint or comment. *Crowder Aff.*, ¶ 47.

36. In December 2003, I wrote to NACEPF and provided NACEPF notice that Youngstown no longer intended to make use of NACEPF's channels on a month-to-month basis, and that NACEPF would receive two more checks – one in December 2003 and one in January 2004. *Crowder Aff.*, ¶ 48.

37. All told, following the last payment due NACEPF under the lease in May 2003 (the month following expiration of the Lease in April 2003), Youngstown made nine payments of $1416.67 (or $12,750.03) to NACEPF without objection. *Crowder Aff.*, ¶ 49.

38. As of October 1, 2003, Youngstown made no commercial use of NACEPF's excess capacity and no longer had any subscribers to its wireless cable system. *Crowder Aff.*, ¶ 50.

39. Contrary to Primeau's assertion, Youngstown explicitly chose to renew the Lease for the Renewal Term when it executed the Second Amendment. *Second Amendment*, ¶ 3, p. 2; *Crowder Aff.*, ¶ 52.

40. NACEPF did not notify Youngstown of its election to exercise the Renewal Option. The fact that NACEPF chose to renew its own FCC license in December 2002 has no bearing on whether NACEPF intended to renew the Lease. Irrespective of whether the Lease with Youngstown was renewed, NACEPF was required to renew its own license with the FCC if it wished to retain that license. *Crowder Aff.*, ¶ 53.

41. There was nothing about NACEPF's December 2002 renewal request that would have suggested to Youngstown that NACEPF also intended to renew the Lease when it expired some five months later. To the contrary, the Lease was, as Barr admits in ¶ 5, "scheduled to expire on April 30, 2002,[sic]" at which time NACEPF would have needed its license both for its own purposes and in order to have been able to offer to lease its excess capacity to users other than Youngstown. *Crowder Aff.*, ¶ 54.

42. Primeau admits that he received a NACEPF Channel Lease Analysis from Sprint by February 14, 2003. That analysis was sent by Sprint to the address that Primeau had requested that payment to NACEPF and the accompanying analyses of subscriber numbers be provided. Primeau's assertion that he did not understand the meaning of the document he received in February 2003 is preposterous. That document, as did the many others that Primeau admits to having received, explicitly reflects that the Youngstown subscriber numbers were a small fraction of those required to cause an automatic renewal of the Lease for the Additional Renewal Term. *Crowder Aff.*, ¶ 55.

43. Primeau's calculation of the amounts allegedly owed by Youngstown to NACEPF is wrong in several respects. First, no damages are in fact due NACEPF. Second, Primeau fails to credit Youngstown with the full amount it paid NACEPF

following the expiration of the Renewal Term in April 2003. Third, the manner in which Primeau determines the monthly Programming Fee is completely without foundation. Youngstown's monthly subscriber numbers have not exceeded 3,817 since June 1997, have not exceeded 2,083 subscribers on a monthly basis in more than four years, and steadily declined throughout the entire Renewal Term. Moreover, given that Youngstown no longer has any subscribers, subscriber levels during the alleged Additional Renewal Term will never be sufficient to entitle NACEPF to a Programming Fee in excess of the annual $5,000 minimum. Nevertheless, Primeau's calculation improperly employs a subscriber count of 7,882 for each and every month of the alleged five-year Additional Renewal Term. Fourth, the total value of the Additional Renewal Term to NACEPF through April 2008 is $85,000.20 (60 payments of $1416.67) of which it has already received from Youngstown $12,750.03. *Crowder Aff.*, ¶ 56.

44. NACEPF could not have "relied on the course of conduct established by Sprint and its subsidiaries in renewing the Amendment [sic] applicable to Youngstown." Instead, the course of conduct establishes: 1) that the NACEPF Channel Lease Analysis provided to NACEPF by Sprint contained notice of subscriber counts that the parties deemed adequate for purposes of the Additional Renewal Term provisions of the Third Amendment; and 2) that NACEPF had ample reason to know that the Lease would expire unless NACEPF attempted to exercise its Renewal Option. *Crowder Aff.*, ¶ 57.

45. Primeau has identified only a subset of the leases amended as May 30, 1997 that contain the renewal language at issue here and claims that "[i]n every one of these other contracts, NACEPF exercised its right to renew the lease for an Additional

Term without providing notice to the Sprint subsidiary . . . ." This is flatly untrue. *Crowder Aff.*, ¶ 58.

46. NACEPF admits that "Sprint continued to pay NACEPF ***the amounts due under the Amendment*** through January 2004," that "Sprint made ***at least nine monthly payments to NACEPF pursuant to the Agreement***," and that "NACEPF accepted all of Sprint's payments." *Complaint,* ¶¶ 14 and 17 (emphases added).

**AMERICAN TELECASTING OF YOUNGSTOWN, INC.,**
By its attorneys,

**BROWN RUDNICK BERLACK ISRAELS LLP**
Jennifer L. Brooks (Bar #6176)
Wayne F. Dennison (admitted *pro hac vice*)
121 South Main Street
Providence, RI 02903
(401) 276-2600
(401) 276-2601 Facsimile

Dated: November 15, 2005