**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC.<br>Plaintiff,<br>v.<br><br>AMERICAN TELECASTING OF YOUNGSTOWN, INC.,<br>Defendant. | ) | Case No. 04-473T |

**AFFIDAVIT OF JENNIFER L. CROWDER**

I, Jennifer L. Crowder, do hereby depose and state under oath as follows:

1. I am employed by Sprint Corporation ("Sprint") as a Contract Administrator for (Wireless) Spectrum Management. I am the person at Sprint directly responsible for administering several contracts between subsidiaries and affiliates of Sprint and the plaintiff in this action, North American Catholic Educational Programming Foundation, Inc. ("NACEPF"). I have actual knowledge of the facts set forth below.

2. Among the contracts for which I am responsible is the ITFS Excess Capacity Airtime Lease Agreement (the "Agreement" or "Lease") between NACEPF and American Telecasting of Youngstown, Inc. ("Youngstown").

3. Youngstown is a subsidiary of American Telecasting, Inc. ("AT"). Both AT and Youngstown are now Sprint subsidiaries, as are a number of other former subsidiaries of AT. Several AT subsidiaries have (or had) similar agreements with NACEPF. I am also responsible for administering those agreements on behalf of Sprint.

## I. The Lease

4. The Lease with NACEPF was executed in December 1991. At that time, AT sought to offer Broadcast Wireless (commercial wireless cable television service) in several metropolitan areas across the United States, including Youngstown, Ohio.

5. The Lease contemplates Youngstown's use of NACEPF's excess capacity on certain broadcast frequencies as means of offering wireless cable television services to potential subscribers in the Youngstown, Ohio area. *Agreement* (attached to Complaint as Exhibit A), Preamble, pp. 1-2.

6. As a basis for executing the Lease, NACEPF "determined that by combining its educational programming with [Youngstown's] commercial programming, a significant increase may be achieved in the number of persons who will have access to [NACEPF's] educational programming ***at little or no additional cost***" to NACEPF. *Agreement*, Preamble, p. 2 (emphasis added).

7. With the exception of using "its best efforts to obtain receive sites and to obtain and maintain in force all licenses, permits and authorizations required for [Youngstown] and [NACEPF] to use the ITFS Channel as contemplated by th[e] Agreement," NACEPF's obligations under the Lease were minimal. *Agreement*, ¶8 (B), p. 25.

8. For example, Youngstown, rather than NACEPF, was to bear the expense associated with obtaining such "licenses, permits and authorizations." *Agreement*, ¶8 (B), p. 25.

9. Youngstown was also to pay "all costs and expenses incident to fulfilling th[e] Agreement." *Agreement*, ¶ 24, p. 36.

10. Similarly, under the Lease, Youngstown was to bear the entire costs of leasing the transmission site and of purchasing and installing "such transmitters, transmission line, modulators, antennas and other equipment as required to operate the ITFS Channels . . . ." *Agreement*, ¶¶ 3 (A) and (B), pp. 12-13. This equipment was then to be leased to back to NACEPF at a nominal cost ($1.00 per year) and NACEPF was charged a nominal maintenance fee (again, $1.00 per year). *Agreement*, ¶¶ 3 (B) and (C), pp. 13-14; ¶ 5 (A), p. 17; and Exhibits C and D, pp. 41-42.

11. Ultimately, NACEPF bore "no responsibility for the loss of or damage to the Leased Equipment . . ." and bore no responsibility for any of the insurance costs associated with the Lease. *Agreement*, ¶ 5 (A), p. 17 and ¶ 14 (A), p. 32.

12. The Lease initially contemplated that NACEPF was to be compensated through a flat $1,000 per month Transmission Fee, a $5,000 per year Programming Fee, and, for those months in which there were in excess of ten-thousand (10,000) monthly subscribers to Youngstown's wireless cable service, a $0.10 per month per subscriber Subscriber Royalty Fee. *Agreement*, ¶¶ 6 (B) and (C), p. 18, ¶ 7 (B), p. 21 and Exhibit D, p. 42.

**II. The Second Amendment**

13. Through a second amendment to the Lease ("Second Amendment"), dated as of May 30, 1997, the annual Programming Fee was changed to require payment to NACEPF of the greater of "five thousand dollars ($5,000.00) or the monthly subscriber fee of twenty (.20) [sic] per subscriber." *Second Amendment*, (attached hereto as Exhibit A), ¶ 1 (B), p. 1. "All computations of programming fees [were to] be based upon the average number of subscribers to [Youngstown's] pay television service . . . . " *Id.*

14. A "subscriber" is defined in the Second Amendment as "a person who is paying for [Youngstown's] basic (first-tier or entry-level) programming service." *Id.* "[T]he average number of subscribers shall equal the number of subscribers as of the last day of the prior month plus the number of subscribers as of the last day of the current month divided by two." *Id.*

15. In the Second Amendment, Youngstown and NACEPF expressly agreed that the "Initial Term [of the Agreement] commenced as of April 30, 1993 . . . ." *Second Amendment*, Preamble, p. 1. The parties further agreed to "extend the Lease through the Renewal Term." *Second Amendment*, ¶ 3, p. 2. Pursuant to the Second Amendment, the Renewal Term was to extend for five years and to commence as April 30, 1998. *Id.*, at Preamble, p. 1.

**II. The Third Amendment**

16. NACEPF and Youngstown also executed a third amendment to the Lease (the "Third Amendment")(attached to Complaint as Exhibit B). The Third Amendment was also dated as of May 30, 1997

17. Like the Second Amendment, the Third Amendment was drafted by NACEPF's counsel, Howard J. Barr ("Barr"). Both amendments bear Barr's initials on their final pages.

18. Although the parties expressly agreed in the contemporaneously dated Second Amendment to extend the Lease through the Renewal Term, the Third Amendment contains a provision addressing the circumstances under which the Lease would be automatically renewed for the same "Renewal Term." *Third Amendment*, ¶ 1 (B)(a), p. 1.

19. The Third Amendment also amends the Lease to expressly provide that "[i]t is acknowledged and agreed that [Youngstown] shall have the ***absolute right not to renew this Agreement*** notwithstanding any provision hereof to the contrary." *Third Amendment*, ¶ 1 (B)(a), p. 1 (emphasis added).

20. The Third Amendment also expressly provides for the expiration of the Agreement at the conclusion of the Renewal Term. *Third Amendment*, ¶ 1 (B)(a), pp. 1-2.

21. Under the Third Amendment, if "the number of Subscribers to [Youngstown's] System, as of the day that is ninety (90) (the "Subscriber Date") days prior to the expiration date of the Renewal Term, does not equal or exceed 7,882 . . . the Agreement shall expire at the end of the Renewal Term unless [NACEPF], at its sole option and discretion, elects to renew the Agreement for the Additional Renewal Term (the "Renewal Option)." *Third Amendment*, ¶ 1 (B)(a), pp. 1-2.

22. NACEPF was provided ten days from the receipt of the Subscriber Information in which to "exercise[] its Renewal Option" and was "deemed to have not exercised the Renewal Option" unless it did so within ten days. *Third Amendment*, ¶ 1 (B)(a), p 2.

## IV. The Parties' Performance

23. Since January 2000, Sprint has provided a check to NACEPF that aggregates payments due NACEPF under the agreements between NACEPF and several former AT subsidiaries, including Youngstown.

24. Along with the check, Sprint provides a break-out by contract of the average number of subscribers in each of several clearly designated municipalities, including Youngstown, Ohio.

25. This monthly reporting tool was captioned "NACEPF Channel Lease Analysis – Sprint BWG" and, as its caption suggests, provides Sprint Broadcast Wireless Group ("BWG")'s analysis of the monthly payments due NACEPF under the various leases. (The January 2003 NACEPF Channel Lease Analysis is attached hereto as Exhibit B).

26. Sprint provided (and, with respect to some of the other agreements, continues to provide) this information to NACEPF because NACEPF's compensation under the Youngstown (and other) leases depended, in part, on the number of wireless cable subscribers served.

27. The NACEPF Channel Lease Analyses also expressly provided an address at Sprint and a telephone number to which "inquiries" could be directed by NACEPF.

28. At the request of John Primeau ("Primeau"), NACEPF's president, both the monthly check and the NACEPF Channel Lease Analysis were and are routinely sent by Federal Express or other Overnight Mail and directed to NACEPF's offices at 2419 Hartford Avenue, Johnston, RI.

29. I am informed that the Overnight Mail address for NACEPF initially referenced in the Lease is that of Primeau's residence rather than the NACEPF offices.

30. Prior to bringing this suit, NACEPF never complained to Sprint about the practice of aggregating the amounts due NACEPF into a single monthly check, about the method by which subscriber information was reported in the NACEPF Channel Lease

Analyses, about the manner in which these materials were sent to NACEPF by Sprint or about the address to which they were directed at Primeau's request.

**V. Youngstown Subscriber Information**

31. With respect to the Lease with Youngstown, both the Programming Fee and the potential Subscriber Royalty Fee are directly dependent on the number of subscribers to Youngstown's wireless cable services.

32. The Agreement, as amended by the Second Amendment, provides that a monthly Subscriber Royalty Fee is due "for each monthly subscriber served by [Youngstown]" over ten thousand subscribers. *Agreement*, Exhibit D, p. 42. The Programming Fee due NACEPF is also dependent upon subscription levels. *Second Amendment*, ¶ 1 (B), p. 1.

33. Given that the Programming Fee is to be the greater of $5,000 annually or twenty cents ($0.20) per month per subscriber, Youngstown is obligated to pay NACEPF a per subscriber Programming Fee only if the annual number of monthly subscribers exceeds 25,000 (or, on average, 2,083 subscribers per month).

34. Since September 2001, the number of monthly subscribers to Youngstown's services has never exceeded 2,083. Accordingly, from September 2001 through the end of the Renewal Term of the Lease, Sprint provided NACEPF with monthly Programming Fee payments of $416.67, an amount that is one-twelfth of the annual minimum Programming Fee payment of $5,000.

35. On February 13, 2003, ten business days following the Subscriber Date referenced in the Third Amendment, Sprint sent NACEPF an analysis that, among other information, explicitly indicated that the average number of Youngstown subscribers for

January 2003 was 1,616 (approximately one-fifth the 7,882 subscribers required to trigger an automatic renewal of the Agreement for the Additional Renewal Term).

36. In January 2003, Sprint had reported to NACEPF similar subscription numbers (1,649 average subscribers) with respect to Youngstown for December 2002.

37. Since the execution of the Third Amendment (or of the Agreement), the number of monthly Youngstown subscribers has never approached the 7,882 subscribers required to trigger automatic renewal for the Additional Renewal Term.

38. Upon receipt of the check from Sprint, dated February 13, 2003, and of the accompanying NACEPF Channel Lease Analysis, NACEPF cashed Sprint's check without protest.

39. Upon receipt of the Youngstown subscriber information for January 2003, NACEPF did nothing to exercise the Renewal Option referenced in the Third Amendment.

40. Between February and December 2003, NACEPF did not contact Sprint or Youngstown with respect to the Lease and made no affirmative act made known either to Sprint or to Youngstown to effect the exercise of the Renewal Option.

41. Had NACEPF sought to exercise its Renewal Option upon receipt of the January 2003 subscriber information, Youngstown would have had the option to assert its "***absolute right not to renew*** th[e] Agreement notwithstanding any provision . . . to the contrary." *Third Amendment*, ¶ 1 (B)(a), p. 1 (emphasis added).

42. By February 2003, neither Youngstown nor Sprint expected to provide wireless cable ***television*** service in the Youngstown, Ohio area through April 2008. However, Sprint had made public its intention to develop a wireless broadband ***data***

service and had attempted to renegotiate its leases with NACEPF (including the Youngstown Lease) to accommodate this alternative use.

43. On April 30, 2003, the Lease expired pursuant to the terms of Third Amendment.

**VI. Post-Expiration**

44. Youngstown thereafter continued to provide payment on a month-to-month basis for its minimal use of NACEPF's ITFS excess capacity.

45. After the April 30, 2003 expiration of the Lease, NACEPF and Youngstown no longer had a formal agreement with respect to the nature of Youngstown's minimal use of NACEPF's excess capacity.

46. Nevertheless, Sprint on behalf of Youngstown made payments in an amount equal to the monthly Transmission Fee provided under the expired Lease and one-twelfth of the minimum annual Programming Fee.

47. NACEPF accepted this amount, $1416.67, without complaint or comment.

48. In December 2003, I wrote to NACEPF and provided NACEPF notice that Youngstown no longer intended to make use of NACEPF's channels on a month-to-month basis, and that NACEPF would receive two more checks – one in December 2003 and one in January 2004.

49. All told, following the last payment due NACEPF under the lease in May 2003 (the month following expiration of the Lease in April 2003), Youngstown made nine payments of $1416.67 (or $12,750.03) to NACEPF without objection.

50. As of October 1, 2003, Youngstown made no commercial use of NACEPF's excess capacity and no longer had any subscribers to its wireless cable system.

**VII. The Primeau and Barr Affidavits**

51. I have reviewed the affidavits of Primeau and Barr filed by NACEPF in this action and dispute several of the factual assertions made in those affidavits.

52. Primeau asserts in ¶ 9 of his affidavit, that the Lease automatically renewed for the first Renewal Term (through April 2003), because Youngstown did not make a required election not to renew the Lease. Contrary to Primeau's assertion, Youngstown explicitly chose to renew the Lease for the Renewal Term when it executed the Second Amendment. *Second Amendment*, ¶ 3, p. 2.

53. Contrary to Primeau's apparent assertion in ¶¶ 11 and 17, NACEPF did not notify Youngstown of its election to exercise the Renewal Option. The fact that NACEPF chose to renew its own FCC license in December 2002 has no bearing on whether NACEPF intended to renew the Lease. Irrespective of whether the Lease with Youngstown was renewed, NACEPF was required to renew its own license with the FCC if it wished to retain that license.

54. There was nothing about NACEPF's December 2002 renewal request that would have suggested to Youngstown that NACEPF also intended to renew the Lease when it expired some five months later. To the contrary, the Lease was, as Barr admits in ¶ 5, "scheduled to expire on April 30, 2002,"at which time NACEPF would have needed its license both for its own purposes and in order to have been able to offer to lease its excess capacity to users other than Youngstown.

55. Primeau admits that he received a NACEPF Channel Lease Analysis from Sprint by February 14, 2003. That analysis was sent by Sprint to the address that Primeau had requested that payment to NACEPF and the accompanying analyses of subscriber numbers be provided. Primeau's assertion that he did not understand the meaning of the document he received in February 2003 is preposterous. That document, as did the many others that Primeau admits to having received, explicitly reflects that the Youngstown subscriber numbers were a small fraction of those required to cause an automatic renewal of the Lease for the Additional Renewal Term.

56. Primeau's calculation of the amounts allegedly owed by Youngstown to NACEPF is wrong in several respects. First, no damages are in fact due NACEPF. Second, Primeau fails to credit Youngstown with the full amount it paid NACEPF following the expiration of the Renewal Term in April 2003. Third, the manner in which Primeau determines the monthly Programming Fee is completely without foundation. Youngstown's monthly subscriber numbers have not exceeded 3,817 since June 1997, have not exceeded 2,083 subscribers on a monthly basis in more than four years, and steadily declined throughout the entire Renewal Term. Moreover, given that Youngstown no longer has any subscribers, subscriber levels during the alleged Additional Renewal Term will never be sufficient to entitle NACEPF to a Programming Fee in excess of the annual $5,000 minimum. Nevertheless, Primeau's calculation improperly employs a subscriber count of 7,882 for each and every month of the alleged five-year Additional Renewal Term. Fourth, the total value of the Additional Renewal Term to NACEPF through April 2008 is $85,000.20 (60 payments of $1416.67) of which it has already received from Youngstown $12,750.03.

57. Contrary to Primeau's assertion in ¶¶ 21 and 22, NACEPF could not have "relied on the course of conduct established by Sprint and its subsidiaries in renewing the Amendment [sic] applicable to Youngstown." Instead, the course of conduct establishes: 1) that the NACEPF Channel Lease Analysis provided to NACEPF by Sprint contained notice of subscriber counts that the parties deemed adequate for purposes of the Additional Renewal Term provisions of the Third Amendment; and 2) that NACEPF had ample reason to know that the Lease would expire unless NACEPF attempted to exercise its Renewal Option.

58. Primeau has identified only a subset of the leases amended as May 30, 1997 that contain the renewal language at issue here and claims that "[i]n every one of these other contracts, NACEPF exercised its right to renew the lease for an Additional Term without providing notice to the Sprint subsidiary . . . ." This is flatly untrue. Twelve separate leases (inclusive of Youngstown) were amended by the parties as of May 30, 1997. In eight of those cases, including six referenced by Primeau (Colorado Springs, CO; Lansing, MI; Santa Rosa, CA; Denver, CO; Seattle, WA; and Columbus, OH), Sprint wished to retain rights to NACEPF's ITFS excess capacity for the Additional Renewal Term despite the fact that the subscriber levels were below the minimum subscriber thresholds. In order to keep the leases from expiring pursuant to terms of the Third Amendment, in each of these eight cases, Sprint wrote NACEPF after the "Subscriber Date" (in once case more than a month after the Subscriber Date) indicating that it would increase its payments to NACEPF and thereafter increased its Programming Fee payments to a level equal to that which would have been owed to NACEPF if the subscriber threshold for automatic renewal had been reached. In other words, Sprint

began paying NACEPF on these eight contracts as if there were a sufficient number of subscribers to keep them from expiring. NACEPF was sent eight such letters (each to its 2419 Hartford Avenue, Johnston, RI address) between January 2002 and August 2002. Not one of these letters (nor any of the increased payments to NACEPF contemplated by them) was rejected by NACEPF. NACEPF never complained about any alleged inadequacy of the subscriber count nor about the dates upon which the subscriber count information or letters were received. Because Sprint intended to permit that Lease to simply expire by its terms, no such letter was sent with respect to Youngstown.

59. The Yuba City, CA agreement that is referenced in Primeau's list of contracts for which NACEPF "followed exactly the same practice in renewing" was, by contrast, renewed through a formal request made by Primeau in writing.

60. Barr's assertion in ¶ 7 of his affidavit that he and I had "several discussions and exchange of correspondence" is similarly inaccurate. I do not believe that I have ever spoken with Barr, and have exchanged letters with him just once. (My march 9, 2004 letter to Barr is attached as Exhibit C.)

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14 DAY OF NOVEMBER, 2005

[signature]
Jennifer L. Crowder

Notary Endorsement:
STATE OF KANSAS
COUNTY OF JOHNSON

Subscribed + sworn to before me, a Notary Public, this [14th day] of November 2005.

LORA E. BURTON
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 10/31/2006

[signature]
Notary Public