UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH AMERICAN CATHOLIC EDUCATIONAL PROGRAMMING FOUNDATION, INC., | : | |
| Plaintiff, | : | |
| v. | : | No. 04-473-T |
| SPRINT CORPORATION and AMERICAN TELECASTING OF YOUNGSTOWN, INC., | : | |
| Defendants. | : | |

**SECOND SUPPLEMENTAL AFFIDAVIT OF JOHN PRIMEAU**

I, John Primeau, hereby declare and state as follows:

1. I am the president of North American Catholic Educational Programming Foundation, Inc. ("NACEPF"). I have personal knowledge of the facts set forth below.

2. In 1991, NACEPF entered into an agreement captioned ITFS Excess Capacity Airtime Lease Agreement (the "Agreement"), attached to the Complaint as Exhibit A, with American Telecasting of Youngstown, Inc. ("American"). The Agreement related to the Youngstown, Ohio metropolitan area. The Agreement contemplated that American would use excess broadcast Spectrum licensed to NACEPF for providing subscription television programming. See Agreement, p. 1.

3. In April 1999 Sprint Corporation ("Sprint") entered definitive agreements to acquire American. See Exh. A hereto. In September 1999, Sprint concluded the transaction (see attached Exhibit B) and acquired American as a wholly owned subsidiary. As Exhibit A reflects, Sprint intended to use the broadcast spectrum controlled by American for telephony and

data related services, and noted that "Sprint can provide multi-megabit data, voice, Internet and video conferencing services." In contrast, the Agreement had dealt exclusively with the provision of television programming.

4. Under the Agreement, Sprint agreed to pay NACEPF transmission fees of $1,000 per month and a monthly subscriber royalty fee of $0.20 per subscriber, based on the average number of subscribers, with a minimum of $5,000 in subscriber royalty fees annually. See Agreement, ¶ 6; Second Amendment to the ITFS Excess Capacity Airtime Lease Agreement, attached to the affidavit of Jennifer Crowder as Exhibit A. Thus, the greater the number of paid television subscribers in the Youngstown market, the more American was required to pay NACEPF each month in subscriber fees.

5. According to information sent to me by Sprint, the number of subscribers in the Youngstown market in August and September 1999 (when Sprint's acquisition of American was completed) was 3,016 and 2,912, respectively. Thus, the average subscriber count as of the time of the acquisition was 2,964.

6. The number of subscribers in the Youngstown market declined substantially after Sprint's acquisition of American in September 1999. For example, by February 2003, the number of subscribers was only 1,616. In my view, this decline is attributable to the fact that Sprint neglected American's wireless cable television enterprise because Sprint acquired this spectrum for an entirely difference business purpose (see paragraph 3 above). As a result, the number of subscription television subscribers in Youngstown steadily decreased after Sprint acquired American. Of course, as the subscriber base dwindled, Sprint's monthly payment obligation to NACEPF under the Agreement declined proportionately. As a result, in calculating NACEPF's damages in this case, NACEPF's lost subscription fees should be based on the level

of subscribers as of September 1999 (2,964) -- when Sprint first acquired American -- rather than on the level at some later time, after the subscriber base dwindled. Thus, NACEPF's damage claim for the period from May 1, 2003 through April 30, 2008 is as follows:

| | | |
|---|---|---|
| Minimum Monthly Transmission Fee : | $1,000.00 X 60 months = | $60,000.00 |
| Monthly Subscriber Fee: (2,964 subscribers) | $2,964 X $.20 X 60 months = | $35,568 |
| **Total:** | | **$95,568** |

7. In addition, NACEPF claims as damages in this case, pursuant to R.I. Gen. Laws § 9-1-45, its legal fees. As of the time this action was filed, NACEPF had incurred in excess of $2,750 in legal fees. The fees have increased substantially since that time. I note that, according to Sprint, the maximum value to NACEPF of the third renewal term of the Agreement is $85,000. I further note that, according to Sprint, it has already paid NACEPF $12,750.03 pursuant to the third renewal term, with the result that NACEPF's maximum recovery in this case is $72,249.97. Even if Sprint's figures are accepted as true, however, there was still more than $75,000 in controversy at the time this action was filed, because NACEPF's attorney fees exceeded $2,750 at that time, and $72,249.97 plus $2,750$^{+}$ exceeds $75,000.

8. The Court should also be aware that under Section 3 of the Agreement, Sprint must provide the tower lease, technical labor and all transmission facilities and equipment. The cost and maintenance of these items would exceed the damages outlined the foregoing paragraph if Sprint prevailed in its position that the Agreement was properly terminated.

9. NACEPF is entitled to recover its attorney fees under R.I. Gen. Laws § 9-1-45 because there is a complete absence of any justiciable issue of law or fact in this case. In support of this position I hereby incorporate by reference the two affidavits I previously submitted in this matter, as well as the Corrected Memorandum in Support of Plaintiff North American Catholic

Educational Programming Foundation, Inc.'s Motion for Summary Judgment. In short, there was absolutely no basis for Sprint to discontinue making payments to NACEPF under the Third Amendment to the Agreement.

10. NACEPF may be entitled to additional damages, attorney's fees and costs permitted by law.

John Primeau

Sworn to before me this 9th day of January, 2006.

Notary Public
My Commission Expires: 4-7-08